IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

PRECISION SEED CLEANERS,
an Oregon corporation,

     Plaintiff,        No. 03:10-cv-01023-HZ

   v.

COUNTRY MUTUAL INSURANCE    OPINION & ORDER
COMPANY, a foreign business
corporation,

     Defendant.

Douglas M. Bragg
Frederick M. Millard
FRED MILLARD, ATTORNEY AT LAW, P.C.
6650 SW Redwood Lane
Suite 330
Portland, Oregon 97224

   Attorneys for Plaintiff

/ / /

1 - OPINION & ORDER

Daniel E. Thenell
Jillian M. Hinman
THENELL LAW GROUP, PC
12909 SW 68th Parkway, Suite 320
Portland, Oregon 97223

Attorneys for Defendant

HERNANDEZ, District Judge:

Plaintiff Precision Seed Cleaners brings this action against its insurer defendant Country

Mutual Insurance Company contending that defendant breached an insurance policy issued to

plaintiff by failing to pay for inventory and property destroyed in a fire. Plaintiff also brings

claims arising out of the issuance of the insurance policy. Plaintiff moves for partial summary

judgment on the issues of the value of property lost in the fire and prejudgment interest.

Defendant argues that issues of fact preclude summary judgment and that prejudgment interest is

improper. Because I agree with defendant, I deny the motion.

As part of the summary judgment briefing, plaintiff objected to the qualifications of some

of defendant's experts. Defendant subsequently moved to strike some of plaintiff's experts. I

conducted a hearing pursuant to Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579

(1993), on January 23, 2013, which was continued to February 19-20, 2013, to resolve all of the

expert witness objections. I overrule plaintiff's objections and I grant defendant's motion to strike

as to Poe, but otherwise deny it. Additionally, as explained below, I dismiss plaintiff's breach of

contract and breach of the implied duty of good faith and fair dealing claims related to business

interruption coverage.

BACKGROUND

Plaintiff, a seed cleaning business, leased a warehouse which was destroyed by fire on

2 - OPINION & ORDER

August 26, 2009. At the time of the fire, plaintiff had an insurance policy with defendant which provided coverage for various losses plaintiff sustained in the fire, including the loss of plaintiff's seed, the seed of others in plaintiff's possession, and equipment.

Plaintiff alleges that the value of its own property destroyed in the fire is $1,354,615.23; the value of property that belonged to others is $862,847.20; the value of scheduled equipment is $1,437,262.60; and the value of unscheduled equipment and electrical upgrades is $828,921.63. These losses total $4,483,646.66. Plaintiff alleges that it suffered $4,129,031.43 in covered losses. Because defendant paid $700,000 to plaintiff on September 28, 2011, plaintiff seeks summary judgment as to $3,429,031.43 in losses, plus prejudgment interest. Additional facts are noted in the discussion section below.

## STANDARDS

I. Summary Judgment

Summary judgment is appropriate if there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial responsibility of informing the court of the basis of its motion, and identifying those portions of "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).

Once the moving party meets its initial burden of demonstrating the absence of a genuine issue of material fact, the burden then shifts to the nonmoving party to present "specific facts" showing a "genuine issue for trial." Fed. Trade Comm'n v. Stefanchik, 559 F.3d 924, 927-28

(9th Cir. 2009) (internal quotation omitted).  The nonmoving party must go beyond the pleadings and designate facts showing an issue for trial.  Celotex, 477 U.S. at 322-23.

The substantive law governing a claim determines whether a fact is material.  Suever v. Connell, 579 F.3d 1047, 1056 (9th Cir. 2009).  The court draws inferences from the facts in the light most favorable to the nonmoving party.  Long v. City & County of Honolulu, 511 F.3d 901, 905 (9th Cir. 2007).

If the factual context makes the nonmoving party's claim as to the existence of a material issue of fact implausible, that party must come forward with more persuasive evidence to support his claim than would otherwise be necessary.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

II.  Expert Testimony/Daubert

Under Federal Rule of Evidence 702, the trial court may exercise discretion to allow expert testimony if the testimony "will assist the trier of fact to understand the evidence or to determine a fact in issue"; (1) it is "based upon sufficient facts or data"; (2) it is "the product of reliable principles and methods"; and (3) the expert "has applied the principles and methods reliably to the facts of the case."  Fed. R. Evid. 702.

Under Daubert, and cases following it,

[T]he court must assess [an expert's] reasoning or methodology, using as appropriate such criteria as testability, publication in peer reviewed literature, and general acceptance, but the inquiry is a flexible one. Shaky but admissible evidence is to be attacked by cross examination, contrary evidence, and attention to the burden of proof, not exclusion.  In sum, the trial court must assure that the expert testimony "both rests on a reliable foundation and is relevant to the task at hand."

Primiano v. Cook, 598 F.3d 558, 564 (9th Cir. 2010 (quoting Daubert, 509 U.S. at 597) (footnote

omitted).  "Expert opinion testimony is relevant if the knowledge underlying it has a valid

connection to the pertinent inquiry.  And it is reliable if the knowledge underlying it has a

reliable basis in the knowledge and experience of the relevant discipline."  Id. at 565 (internal

quotation marks omitted).

DISCUSSION:  SEED & EQUIPMENT LOSS CLAIMS

I.  Seed Losses

In support of the alleged values, plaintiff relies on the July 12, 2012 Declaration of Paul

Kloft, plaintiff's President.  His experience and education are set forth in his Declaration.  He

states that plaintiff lost a significant amount of its own seed in the fire, and based on his

knowledge and experience, he asserts that the value of that seed is $1,354.615.22.  July 12, 2012

Kloft Decl. at ¶ 12.  He attaches a six-page proof-of-loss log, dated November 19, 2009, showing

the lot number, the grower, the seed company, the seed type, the seed variety, the inbound weight

(if weighed), the sack/bin count, the number of pounds, the cost per pound, and the value for

ninety-five separate seed lots.  Ex. 2 to July 12, 2012 Kloft Decl.

Plaintiff asserts that the value of the seed belonging to others which was lost in the fire is

$862,847.20.  Pl.'s PSJ Mem. at 2.  For support, plaintiff relies on Kloft's Declaration and a

twenty-one page proof-of-loss log, dated November 19, 2009[1], showing the same information as

the logs for the seed belonging to plaintiff.  July 12, 2012 Kloft Decl. at ¶ 13; Ex. 3 to July 12,

2012 Kloft Decl.[2]

---

[1]  Most of Exhibit 3 is dated November 19, 2009, but page 10 is undated, pages 19 and 22
are dated November 18, 2010, and pages 21 and 26 are dated December 1, 2010.

[2]  Six of the twenty-seven pages of Exhibit 3 to Kloft's Declaration are copies of the logs
of plaintiff's own seed submitted in Exhibit 2.  Ex. 3 to July 12, 2012 Kloft Decl. at 12-17.

5 - OPINION & ORDER

In response to plaintiff's motion as to the seed lot losses, defendant relies on an expert report by Katharyn Thompson of RGL Forensics (hereinafter RGL) to argue that there are issues of fact regarding both the existence and value of several seed lots which preclude summary judgment. In reply, plaintiff challenges the admissibility of Thompson's expert testimony.[3] For the reasons explained below, Thompson qualifies as an expert under Federal Rule of Evidence 702 and her opinions are admissible.

Thompson is a Certified Public Accountant (CPA) and is certified in Financial Forensics (CFF). Def.'s Daubert Hrg. Ex. 1.[4] She is a partner in RGL, an international accounting firm which provides forensic accounting services. Id. She has over twenty-five years of experience in

---

Additionally, although plaintiff cites to paragraphs 10-17 of Kloft's Declaration to support its claim that the seed of others is valued at $862,847.20, Kloft never puts forth that total figure himself and instead relies on the values as they appear in the log sheets in Exhibit 3. July 12, 2012 Kloft Decl. at ¶ 13. Not only does the failure to present a total figure in the Declaration create a burden for the Court, when I add up the values in Exhibit 3, I calculate the sum of approximately $604,082. For purposes of the motion, I accept plaintiff's representation that the value of the seed of others is $862,847.20, but, at this point, plaintiff's own evidence in the record does not appear to support that figure.

[3] In its Reply Memorandum, plaintiff also challenges certain statements regarding seed valuation made by expert David Logan. Pl.'s PSJ Reply Mem. at 28. Logan's Expert Report is attached as Exhibit C to Thenell's September 21, 2012 Declaration. It is unclear if plaintiff continues to challenge these statements because plaintiff made no mention of Logan in the Daubert Hearing. Assuming plaintiff's challenge remains, I overrule the objection. The objection is to hearsay statements within Logan's report made by Kevin Loe. However, as explained in more detail below in discussing Thompson's testimony, Rule 703 allows an expert to base an opinion on facts or data reasonably relied on by experts in the field even if those facts or data are themselves inadmissible. Because insurance adjustors such as Logan may reasonably rely on facts by someone like Loe who possesses expertise in the particular industry, Logan may base his opinion on hearsay statements by Loe. Moreover, defendant indicates that Loe will testify at trial.

[4] A transcript of Thompson's testimony from the January 23, 2013 Daubert Hearing is Docket #149. I refer to it as the "Jan. 23, 2013 Daubert Hrg. Trans."

6 - OPINION & ORDER

forensic accounting, which she described as "investigative auditing." Jan. 23, 2013 Daubert Hrg. Trans. at 8. Her CFF is issued by the American Institute of Certified Public Accountants (AICPA), an organization of which Thompson is a member. Id. at 9. The AICPA recognizes forensic accounting as a specialty. Id. at 10. Thompson provides training on forensic accounting for others in her firm, and she has presented forensic accounting information at insurance industry events. Id. at 17. Thompson has qualified as an expert forensic financial accountant several times in insurance claim cases. Id. at 10-11. Valuations as part of an insurance loss are the majority of her business. Id. Other information regarding Thompson's professional experience is detailed in her curriculum vitae, submitted as defendant's Exhibit 1 at the Daubert Hearing, and in the January 23, 2013 Daubert Hearing Transcript.

Defendant's insurance adjustor Ron Gray retained Thompson to analyze the seed loss suffered by plaintiff in the fire. Id. at 24. In her analysis, Thompson and another CPA/CFF in her firm reviewed the insurance policy and examined various business records of plaintiff's. Id. at 25-27. These included bank statements, phone records, tax returns, profit and loss statements, balance sheets and then other documents particular to seed lots such as receiving worksheets, cleaning worksheets, cleaning time worksheets, lab reports, and product movement reports/bills of lading. Id. at 27-28. They also reviewed reports from other experts. Id. at 28,. Although Thompson requested a physical inventory or accounts of inventory from plaintiff, she received only an inventory of flower stock seed valued in the $10,000 range. Id. at 29. Kevin Loe, whose qualifications are discussed below, assisted Thompson in determining what records to review for purposes of evaluating the seed loss. Id. at 30-31.

Thompson also reviewed the transcript of Kloft's Examination Under Oath and his

deposition, along with the deposition transcripts of "Billman, Abbott, and Edminster" identified as plaintiff's seed experts. Id. at 32. She reviewed Loe's report and the expert report of plaintiff's forensic accountant. Id. She also read the deposition testimony of a representative of The Scotts Company. Id. at 33-34.

To explain how she conducted her valuation analysis, Thompson testified about three seed lots in particular. First, she testified about Seed Lot Number M146-8-400. Def.'s Daubert Hrg. Ex. 13 (also in the summary judgment record as Ex. 2 to July 12, 2012 Kloft Decl. at 6). Plaintiff claimed a value of $140 for this particular lot. Id. The "inbound weight" is shown as 1,300 pounds, the "Lbs" are 35, the "Cost/#" is $4.00, and the total value is $140.00, representing the 35 pounds multiplied by $4.00 per pound. Id.; Jan. 23, 2013 Daubert Hrg. Trans. at 39.

The first document Thompson looked at to support plaintiff's claimed $140 value for Lot Number M146-8-400 was the "receiving worksheet." Jan. 23, 2013 Daubert Hrg. Trans. at 40-41; Def.'s Daubert Hrg. Ex. 13 at 2. It shows that plaintiff received 1,300 pounds of Kentucky Bluegrass seed on July 15, 2008. Id. Next, Thompson relied on the "cleaning worksheeet." Jan. 13, 2013 Daubert Hrg. Trans. at 41. It shows the weight of the seed after cleaning to be 1,035 pounds. Id.; Def.'s Daubert Hrg. Ex. 13 at 3. The cleaning worksheet also shows that on August 22, 2008, 1,000 pounds were shipped, leaving 35 pounds with plaintiff. Id.; Jan. 23, 2013 Daubert Hrg. Trans. at 41. The last document she reviewed is a seed analysis report by Oregon State University which determined that the seed met "OSCS purity standard." Def.'s Daubert Hrg. Ex. 13 at 4.

According to Thompson, the quantity of seed plaintiff claimed for Seed Lot Number M146-8-400 was supported by plaintiff's records. Jan. 23, 2013 Daubert Hrg. Trans. at 43.

Thompson, however, did not render an opinion as to the value. Id. at 44. She used values assigned by Loe and incorporated those values into her report. Id. As she explained, Loe provided her with a value per pound and she multiplied that value by the quantity she assessed to arrive at a value for the lot. Id. at 44-45.

Thompson testified regarding two other seed lots and noted some variation among the documents. Id. at 45-50; Def.'s Daubert Hrg. Exs. 14, 15. For example, Seed Lot Number 146-7-537, highlighted in defendant's Daubert Hearing Exhibit 14, had a bill of lading or product movement report in addition to other documents, and Seed Lot Number 146-8-403 had a cleaning time worksheet as well.

Thompson explained that although plaintiff produced most of the cleaning worksheets related to each of the seed lots at issue, "a lot" of the seed lots were missing receiving worksheets. Jan. 23, 2013 Daubert Hrg. Trans. at 40-42. She also made clear that while she opined on whether there were sufficient records to substantiate the quantity of seed being claimed, she was not opining as to whether that amount was actually lost in the fire. Id. at 43.

Based on her analysis, and the information she received from Loe, Thompson opined that the value of seed that could have been lost in the fire was $1,252,376, for both plaintiff's own seed and the seed of others. Id. at 51; Def.'s Daubert Hrg. Ex. 9 (Thompson Sept. 21, 2012 Report; also in the summary judgment record as Ex. 3 to Bragg Supp'l. Decl.). She testified that to arrive at this figure, she went through the document methodology she described in regard to the three lots highlighted by defendant's Daubert Hearing Exhibits 13, 14, and 15, for every seed lot, to ensure that the underlying documents supported a quantity that would have been on plaintiff's premises at the time of the fire. Jan. 23, 2013 Daubert Hrg. Trans. at 52. Then, she

took the values assigned by Loe, inputted them into the worksheets, and "came up

mathematically with a final number." Id.  In her report, she segregated the seed lots into those

where all documentation was provided, those that were missing lab reports, those that were

missing receiving worksheets, etc.  Id. at 52, 55.

On October 25, 2012, Thompson issued an addendum to her September 21, 2012 report.

Def's Daubert Hrg. Ex. 10.  Among other things, she changed some of the valuations based on

further information obtained from Loe regarding the application of a twenty-percent discount to

those lots missing laboratory reports.  Jan. 23, 2013 Daubert Hrg. Trans. at 61.

Thompson described her work with Loe in arriving at her opinions.  First, the initial

pricing she used was based on plaintiff's claim.  Id. at 8-0-81.  She then met with Loe for several

hours before issuing her September 21, 2012 report.  Id. at 74-77.  Together, they looked at every

seed lot claimed.  Id.  Loe looked at the lab results for each seed lot and offered opinions about

problems he saw that would affect the pricing.  Id.  In many cases, he gave a twenty-percent

adjustment.  Id.; see also id. at 78-81.  Thompson herself did not arrive at an independent opinion

regarding the quality or price per pound of the seed that plaintiff claimed was lost in the fire.  Id.

at 73.

Plaintiff contends that Thompson's report fails under each subsection of Rule 702:  (1)

she does not have "scientific, technical, or other specialized knowledge" in relation to valuing

seed, determining salable quantity of seed, or determining the quantity of seed under Rule 702(a);

(2) in determining the quality of seed, she failed to consider statutorily mandated seed quality

standards demonstrating that she was operating from insufficient facts and data under Rule

702(b); (3) she invented her own method of valuing seed, which is not a "reliable principal and

method" under Rule 702(c); and (4) she did not apply her own valuation method consistently for all seed lots under Rule 702(d).  Plaintiff further objects that Thompson impermissibly parrots the expert opinions of other, non-testifying seed experts.

Plaintiff does not challenge Thompson's credibility as a forensic accountant.  A careful reading of plaintiff's challenge shows that it is limited to the seed valuations, including price adjustments and quality determinations.  Thompson made clear that the seed valuations, as opposed to the quantity determinations, were made by Loe.  Thompson used her expertise to review the records substantiating the claimed quantities.  I do not understand plaintiff to be challenging that part of Thompson's report.  Even if it were, defendant qualified Thompson as an expert under Rule 702 and established that she possesses specialized knowledge in forensic accounting, meaning the process of auditing records to establish a claim.  Additionally, her testimony regarding the seed quantities was supported by sufficient facts or data, her testimony is the product of reliable principles and methods, and she reliably applied the principles and methods to the facts of the case.

In particular, Thompson established her methodology of reviewing the pertinent records supporting the quantity of seed claimed for each seed lot and explained how she applied that methodology to offer an opinion as to whether the records supported the amount claimed.  There is nothing in the record to suggest that she did anything other than follow her established methodology for each seed lot.  To the extent plaintiff challenges the non-valuation aspect of Thompson's report, the objection is overruled.

As to the valuations and pricing opinions contained within Thompson's report, plaintiff has made no direct challenge to Loe's opinions, either in plaintiff's briefing or at the Daubert

11 - OPINION & ORDER

Hearing.  Plaintiff makes no argument that Loe's opinions are unreliable.  Plaintiff also did not

present its own expert seed testimony at the Daubert Hearing in an effort to challenge Loe's

valuation opinions contained in Thompson's report.  Plaintiff's challenge was solely to

Thompson's report.

Defendant argues that Thompson's opinion is admissible because Rule 703 allows an

expert to base an opinion on facts or data the expert has been made aware of, including the

reliable opinions of other experts.  Defendant asserts that is all that occurred here:  Thompson

applied generally accepted accounting principles to data obtained from Loe who is versed in the

seed industry.

Under Rule 703, "[a]n expert may base his opinion at trial on inadmissible facts and data

of a type reasonably relied upon by experts in the field."  United States v. Gonzales, 307 F.3d

906, 910 (9th Cir. 2002).  "Experts are permitted to rely on hearsay, including the opinions of

other experts, if proper foundation is laid that others in the field would likewise rely on them."

Mesfun v. Hagos, No. 03-02182, 2005 WL 5956612, at *18 (C.D. Cal. Feb. 16, 2005) (citing,

inter alia, Calva-Cerqueira v. United States, 281 F. Supp. 2d 279, 300 (D.D.C. 2003) ("As stated

previously, an expert economist may rely on the opinions of other experts")).

At the Daubert Hearing, defendant was prepared to call Gregson Parker as a witness to

establish that in rendering their opinions, forensic accountant experts in insurance claim cases

routinely rely on other experts in a particular field.  I instructed defendant that such testimony

was unnecessary because I had already determined that under Rules 702 and 703, courts regularly

allow accountants, financial experts, auditors, and appraisers to rely on reports, documents, and

other experts' opinions when rendering their own opinions, as long as there is no challenge to the

12 - OPINION & ORDER

reliability of the underlying data.  See, e.g., De Saracho v. Custom Food Mach., Inc., 206 F.3d 874, 879-80 (9th Cir. 2000) (upholding admission of testimony of CPA who relied on loan agreements to calculate the interest due on loans); Microfinancial, Inc. v. Premier Holidays Int'l, Inc., 385 F.3d 72, 80 (1st Cir. 2004) (upholding admission of testimony of an IRS financial fraud expert even though he did not have previous experience with "lock box accounts" because "Rule 702 is not so wooden as to demand an intimate level of familiarity with every component of a transaction or device as a prerequisite to offering expert testimony[,]" and that when an expert is "'qualified . . . by knowledge, skill, experience, training, or education,' Fed. R. Evid. 702, he need not have had first-hand dealings with the precise type of event that is at issue.").

The record in this case shows that Loe has extensive experience in the seed industry.  Pl.'s Daubert Hrg. Ex. 301.  He currently owns a business which produces flower, grass, wildflower, native, and vegetable seeds.  Id.  He is the fourth generation of his family to farm his family's "century farm."  Id.  His business produces several hundred different seed crops annually, for retail and wholesale customers, and also offers contract production and custom seed processing to other companies.  Id.  Additionally, the company offers seed cleaning services in a seed cleaning facility that can handle a capacity of seed lot sizes.  Id.

Loe has been in the seed business since he was eight years old and since the early 1980s has been in the business of producing and processing flower, vegetable, and native seeds.  Id.  He is a member of the American Seed Trade Association and Oregon Seed Trade.  Id.  He possesses a Seed Dealer License from the State of Oregon as well as a Certified Warehouse from Oregon State Seed.  Id.  Although he has no prior experience providing expert testimony, his experience qualifies him under Rule 702 to offer an opinion on various aspects of the seed business,

13 - OPINION & ORDER

including the value of seed.

Plaintiff contends that an expert cannot give the opinions of others, or base an opinion on another expert who has not and will not testify. In response to plaintiff's objection, defendant notes that Loe will testify at trial. Def.'s Resp. to Pl.'s Objs. to Def.'s Exp. Reports at 6. Thus, plaintiff's objection on that basis has no support.[5] Further, other cases cited by plaintiff are inapposite because they address an expert's reliance on the opinion of another expert generated in different litigation. For example, the Central District of California excluded testimony from an accountant expert who relied on excerpts from a residual valuation report authored by an expert in a different case and who may have been unaware that the accountant was actually using his report. In re Imperial Credit Indus., Inc. Secs. Litig., 252 F. Supp. 2d 1005, 1010, 1012 (C.D. Cal. 2003) (noting also that the author of the excerpted report was not going to testify in the case).

At this point, the narrow challenge raised by plaintiff in the context of the summary judgment motion is that Thompson is not qualified to opine on the seed quality and values and her report is therefore inadmissible. Plaintiff makes no challenge to the reliability or admissibility of Loe's opinions which Thompson incorporated. Within that context, Thompson's report is admissible because, on the present record, Loe qualifies as a seed valuation expert and he is expected to testify at trial where plaintiff can cross-examine him regarding his assumptions and methodology. At this point, the challenge to Thompson's testimony is overruled.

With Thompson's opinions admissible, there are issues of fact regarding plaintiff's asserted values of several seed lots. As to a particular seed lot where Thompson's valuation

---

[5] Should Loe not testify at trial, plaintiff may renew its objection.

14 - OPINION & ORDER

differs from plaintiff's, summary judgment is denied.  Although there is agreement between plaintiff and defendant as to the value of several seed lots, plaintiff is not entitled to summary judgment on those values because evidence in the record, when viewed in light most favorable to defendant, the non-moving party, creates an issue of fact as to whether some of the seed lots were actually in plaintiff's possession, or in the particular warehouse that burned, at the time of the fire.

For example, Thompson testified that there were no physical inventories produced to her other than for flower stock seed.  Jan. 23, 2013 Daubert Hrg. Trans. at 29; Def.'s Daubert Hrg. Ex 9 at 3/Ex. 3 to Supp'l Bragg Decl. at 3.  She also noted that plaintiff never listed a seed inventory as an asset on the balance sheet of its tax return or in its own internal financial statements.  Jan. 23, 2013 Daubert Hrg. Trans. at 53; see also Def.'s Daubert Hrg. Ex. 9 at 3/Ex. 3 to Supp'l Bragg Decl. at 3.  Typically, such assets are listed on balance sheets and tax returns.  Id.  Additionally, there were a number of seed lots that did not have all of the expected corresponding underlying documents.  Id.  Further, her September 12, 2012 report states that plaintiff was moving inventory at the time of the fire and did not track the inventory by building location, making it impossible for Thompson to confirm that the claimed lost seeds were in the building that burned.  Def.'s Daubert Hrg. Ex. 9 at 6/Ex. 3 to Supp'l Bragg Decl. at 6.

Based on the summary judgment record, Thompson's testimony at the Daubert Hearing, and the exhibits submitted at the Daubert Hearing, there are issues of fact regarding the valuation of several seed lots as well as issues of fact regarding whether seed lots were actually lost in the fire.  As a result, plaintiff's motion for summary judgment on the seed loss claims is denied.

/ / /

15 - OPINION & ORDER

II.  Equipment Losses

    A.  Valuation/Slack Report

        As with the seed losses, plaintiff relies on Kloft's Declaration to support its claimed

equipment losses.  Kloft states that $1,437.262.60 of scheduled equipment and $828,921.63 of

unscheduled equipment and electrical upgrades were lost in the fire.  July 12, 2012 Kloft Decl. at

¶¶ 16, 17.  In support, Kloft relies on the June 5, 2010 proof-of-loss logs listing all of the

equipment.  Exs. 4, 5 to July 12, 2012 Kloft Decl.

        In response to plaintiff's claimed lost equipment values, defendant relies on an expert

report by Byron Slack of National Appraisal Company to argue that there are issues of fact

precluding summary judgment.  In reply, plaintiff challenges the admissibility of Slack's expert

testimony.  For the reasons explained below, Slack qualifies as an expert under Rule 702 and his

opinions are admissible.

        A complete copy of Slack's expert report was submitted at the Daubert Hearing as

defendant's Exhibit 17.  It is also found in the summary judgment record as Exhibit 4 to Bragg's

Supplemental Declaration.

        Slack is one of the owners of National Appraisal Company.  Jan. 23, 2013 Daubert Hrg.

Trans. at 7.  He has been in the appraisal business since 1961.  Id. at 8.  He is a licensed appraiser

in four states, including Oregon.  Def.'s Daubert Hrg. Ex. 17/Ex. 4 to Bragg Supp'l Decl. He is a

member of the American Society of Appraisers (ASA), receiving a senior appraiser designation

in 1973.  Jan. 23, 2013 Daubert Hrg. Trans. at 9; Def's Daubert Hrg. Ex. 17.  He assisted in

writing the ASA course book on valuing machinery and equipment.  Jan. 23, 2013 Daubert Hrg.

Trans. at 9-10. He has testified as an expert regarding the valuation of machinery or equipment

16 - OPINION & ORDER

"[p]robably a hundred times" and has testified in federal court on the issue eight or ten times. <u>Id.</u> at 10. Additionally, he has performed equipment and machinery appraisals requiring him to sift through the remains of a fire at least twenty-five times. <u>Id.</u> at 16.

Slack was hired by David Logan, an insurance adjustor, to value the machinery and equipment lost in the fire. <u>Id.</u> at 11. Typically, he first receives invoices, serial numbers, and the proof of loss from the insured. <u>Id.</u> at 11-12. From this information, he learns when the equipment was purchased, how much it cost when new, and what size or grade it was. <u>Id.</u> at 12. He then inspects the equipment and looks at its wear and tear. <u>Id.</u>

In this case, Slack explained that because there was a total loss, he made some assumptions about the equipment. <u>Id.</u> He assumed the machine or piece of equipment was running and was used in the seed processing. <u>Id.</u> More fundamentally, he had to try and identify all the pieces of equipment and machinery that plaintiff claimed were lost. <u>Id.</u> He went to the scene of the fire several times, the first time soon after the fire. <u>Id.</u> at 12-13; <u>see also</u> Def.'s Daubert Hrg. Exh. 17 at 4/Ex. 4 to Supp'l Bragg Decl. at 4 (showing inspection on Aug. 25, 2009); Ex. 6 to Supp'l Bragg Decl. (invoice showing inspections on September 3, 2009, November 30, 2009, and December 11, 2009). On December 11, 2009, he spent several hours using an excavator to move and locate damaged machinery. Jan. 23, 2013 Daubert Hrg Trans. at 36.

Slack testified that he could not find many items claimed on the proof-of-loss logs. <u>Id.</u> at 14. As an example, he testified about cleaning screens. <u>Id.</u> Slack counted close to 300, and ended up valuing 300 because he believed there could be some screens on pieces of equipment that should be accounted for. <u>Id.</u> at 15. But, this was far less than the number claimed by

17 - OPINION & ORDER

plaintiff.  Id.  In another example, he testified that plaintiff claimed that four "agri vacs" had been lost, but Slack found only one in the fire debris.  Id. at 15-16.

Once the equipment or machinery has been identified, Slack appraises its value.  Id. at 16-17.  He begins with a dealer to obtain the new cost of the item.  Id.  From that, he makes deductions for obsolescence and depreciation.  Id. at 17.  For depreciation, he surveys the used market and determines the going price for the pieces of equipment.  Id.  In the end, Slack assigned a value to several pieces of plaintiff's equipment.  These were contained in his April 2010 written report.  Def.'s Daubert Hrg. Ex. 17/ Ex. 4 to Bragg Supp'l Decl.

In his report, Slack assessed, when appropriate, the replacement cost new (RCN, but referred to more frequently as the replacement cost value or RCV), the insured's RCN, and the actual cash value (ACV).  Id.  He also identified some items as "DNV" meaning "did not view," even though he assigned some of them a value.  Id.  Finally, he included a list of machinery and equipment not found.  Id. In the end, Slack opined that the total RCN for both scheduled and unscheduled equipment was $1,774,408, and the total ACV for both scheduled and unscheduled equipment was $819,199.  Id.

Plaintiff contends that Slack's opinion as to whether items were or were not lost in the fire is inadmissible.  Plaintiff specifically challenges whether Slack's report is based on sufficient facts and data under Rule 702(b) and whether Slack reliably applied his methodology under Rule 702(d).  As to its Rule 702(b) argument, plaintiff points to a statement in the "Valuation Overview" section of the narrative portion of Slack's report in which Slack states that "[t]his appraisal report will differ from the insured's estimated loss due to some of the assets were either not found at the site or require additional information.  Some items were crushed and beyond

18 - OPINION & ORDER

recognition at the time of our inspection." Def.'s Daubert Hrg. Ex. 17 at 10/Ex. 4 to Bragg Supp'l

Decl. at 10. Plaintiff argues that these statements are an acknowledgment or admission by Slack

that more work needs to be done to determine what was lost in the fire and that his visual

inspection was insufficient, meaning Slack lacked sufficient facts or data to form an opinion.

As to the Rule 702(d) argument, plaintiff argues that Slack's report fails to show that the

condition of the property was the same in December 2009 when he inspected it with the

excavator, as it was on the date of the fire in August 2009 and without such evidence, Slack

cannot establish that he reliably applied his methodology to the facts of this case. Plaintiff also

argues that Slack fails to identify the documents that he reviewed.

As I explained at the February 19, 2013 Daubert hearing, Slack is allowed to testify

regarding what equipment and machinery he found and did not find in his inspections of

plaintiff's property. He is not allowed, however, to offer an opinion as to whether the equipment

and machinery he did not find was actually lost in the fire because that opinion is not within his

appraisal expertise and would be an improper attack on Kloft's credibility. By opining that the

equipment was not actually lost in the fire because he could not find it on the premises in

December 2009, Slack would essentially be testifying that Kloft lied in his proof of loss. While

an expert witness "may testify in the form of an opinion or otherwise if . . . the expert's . . .

specialized knowledge will help the trier of fact to understand the evidence or to determine a fact

in issue[,]" Fed. R. Evid. 702, this part of Slack's testimony invades the jury's role of determining

a witness's credibility. E.g., Hunt v. City of Portland, No. 03:08–cv–00802–AC, 2011 WL

1899772, at *4 (D. Or. May 19, 2011) (excluding expert witness testimony which improperly

commented on the plaintiff's credibility), aff'd, 2012 WL 5351227, at *1 (9th Cir. Oct. 24, 2012)

19 - OPINION & ORDER

(district court properly excluded part of the medical expert's testimony regarding the plaintiff's believability); see also United States v. Binder, 769 F.2d 595, 602 (9th Cir. 1985) (because credibility is issue for jury, psychiatric experts may not testify specifically as to credibility or buttress credibility improperly), overruled on other grounds, United States v. Morales, 108 F.3d 1031, 1035 n. 1. (9th Cir. 1997).

Assuming plaintiff nonetheless objects to Slack's testimony regarding what he found at the site, I overrule the objection. Any attack on Slack's opinion as to what was there or not there goes to the weight of his testimony, not its admissibility. The comments plaintiff challenges are not an admission that Slack lacked sufficient facts or data to opine on what he found or did not find. As I read his report, he states that his report differs from plaintiff's claimed losses because (1) some of the assets were not found; (2) some require additional information; and (3) some were crushed and beyond recognition. As such, Slack was unable to assign a value consistent with that claimed by plaintiff for a variety of reasons, including that some pieces of equipment were missing. The comments do not constitute an admission that he lacked sufficient data or facts to conclude that certain equipment was present or not.

On the Rule 702(d) objection, the fact that the site may not have been secure from the August 2009 date of the fire until Slack's inspection in December 2009 does not demonstrate that Slack did not reliably apply his methodology to value the equipment or to determine what was on site at that time. Slack worked with others to discover what equipment was there and what condition it was in. He visually inspected the premises and the equipment and used an excavator to move and locate other equipment. He followed his usual practice of working from the insured's proof of loss to ascertain what equipment to search for. That some of the site may have

20 - OPINION & ORDER

been disturbed goes to the weight of his opinion and is not evidence of a flawed application of the methodology (meaning his visual inspections, use of an excavator, and years of knowledge and experience in knowing what evidence to look for in the fire debris) used to locate the claimed equipment.

Plaintiff's objection to Slack's valuation opinions and his opinion about what he found or did not find at the site in December 2009, is overruled.[6]

My understanding of the parties' dispute regarding the valuation of the equipment losses is that, other than the issue regarding equipment not found on the premises, the parties agree that the ACV of the scheduled equipment is $476,669, and the ACV of the unscheduled equipment is $342.530.  See Def.'s Daubert Hrg. Ex. 17 at 4/Ex. 4 to Bragg Supp'l Decl. at 4; Pl.'s PSJ Reply Mem. at 8 (stating that parties agree that defendant owes plaintiff no less than $819,199 for the ACV for the lost personal property items); see also Def.'s Nov. 9, 2012 Letter Responding to Court's Questions (Dkt 79-1).  Plaintiff contends that it is entitled to partial summary judgment as to this amount.  Defendant contends that this amount was paid to plaintiff on September 29, 2011.  See Def.'s Nov. 9, 2012 Letter Responding to Court's Questions (Dkt. 79-1).  Plaintiff indicates that while defendant paid that sum, it never identified the money as payment for equipment losses.  Thus, there exists a dispute as to whether plaintiff is still entitled to recover the ACV of the equipment valued by Slack.  Plaintiff's motion as to that amount is denied.

B.  RCV v. ACV

---

[6] Plaintiff also argued that because the proof of loss on the scheduled equipment corresponds to each piece of scheduled equipment in the insurance policy, plaintiff establishes that all of the equipment existed.  But, the insurance policy covered four separate buildings and the fire burned only one.  Thus, the listing of the scheduled equipment shows only that plaintiff possessed it, not that it was actually burned in the fire.

Plaintiff seeks partial summary judgment as to the RCV of many items that were destroyed in the fire.  Plaintiff contends that the parties agree on the RCV of most of the equipment items and it has highlighted these items in blue on pages 21-40 of Slack's report submitted as Exhibit 4 to Bragg's Supplemental Declaration.

Defendant contends that to the extent plaintiff stipulates to Slack's determinations on RCV, there exists no dispute as to those items.  Def.'s Nov. 19, 2012 Letter Responding to Court's Questions (Dkt 79-1).  However, defendant states it disputes whether plaintiff is entitled to recover RCV.  Id.  As explained by defendant, RCV is the cost that one would incur to purchase a new item today.  Id.  ACV is computed by subtracting depreciation from the replacement cost.  Id.  The depreciation is usually calculated by establishing a useful life of the item and determining what percentage of that life remains.  Id.  The percentage multiplied by the replacement cost produces the ACV.  Id.

In a 2010 case, Judge Clarke explained that

"Replacement Cost insurance . . . is any type of coverage under which the insurance company agrees . . . to pay the difference between actual cash value and full replacement cost."  Higgins v. Insurance Company of North America, 469 P.2d 766, 772 (Or. 1970).  This type of coverage has limitations: "[t]he basic limitation is that the insured collects on this new for old basis only if the property is repaired or replaced."  Id. (internal citations omitted). "[R]epair or replacement is prerequisite to recovery under the extension. The insured can submit a claim for actual cash value when he chooses and collect any additional amount he may have coming under the replacement cost extension."  Id. at 772–73 When the property is not repaired or replaced, the insured receives actual cash value.

There may be restrictions on the length of time allowed for Plaintiffs to repair and replace: "[i]t is usual to provide that repairs or replacements shall be completed with due diligence and dispatch, ordinarily within 12 months."  Id. at 773 (citations omitted).  If the contract does not set forth a time period to replace, the law will imply a requirement that it be done within a reasonable time. Bourrie v. United States Fidelity and Guaranty Insurance Company, 707 P.2d 60, 63 (Or.

App. 1985).

MLM Prop., LLC v. Country Cas. Ins. Co., No. 01:06-cv-00348-CL, 2010 WL 678149, at *8 (D. Or. Feb. 25, 2010).

Here, the applicable section of the policy provides for replacement cost and states that if the insured elects to have loss or damage "settled on an actual cash value basis," the insured may still make a claim for the additional coverage under the replacement cost option if it notifies the insurer within 180 days after the loss or damage. Ex. 1 to July 12, 2012 Kloft Decl. at 41. The insurer will not pay on a replacement cost basis, however, until the lost or damaged property is actually repaired or replaced and unless the repairs or replacement are made as soon as reasonably possible after the loss or damage. Id.

Plaintiff's counsel states that counsel for both parties have agreed that plaintiff has a reasonable time to replace its business personal property following receipt of the ACV payment by defendant, "whenever that should occur." Bragg Supp'l Decl. at ¶ 7. In interpreting identical policy language, Judge Clarke held that the insureds were "allowed a 'reasonable time' to repair or replace their property, running from the date on which [the insureds] receive the actual cash value of their insured property." Id. at *9.

On the present record, I cannot discern the precise nature of the dispute between the parties regarding the payment of the RCV. I agree with Judge Clarke that the policy language provides that once the insured receives the ACV for a particular piece of property, the insured has a "reasonable time" to repair or replace it in order to make a claim under the policy for RCV. Here, Bragg's Supplemental Declaration indicates that plaintiff has not yet received the ACV for any particular piece of property. However, defendant's November 9, 2012 Letter Responding to

23 - OPINION & ORDER

the Court's Questions indicates that defendant paid plaintiff the ACV for the scheduled and

unscheduled equipment in September 2011.  If so, then that payment of the ACV started the

"reasonable time" clock for plaintiff to repair or replace the equipment.  But, if defendant did not

make clear that the September 2011 payment was the ACV for the lost equipment, it is possible

the "reasonable time" clock has not yet begun.

      While I agree with Judge Clarke's interpretation of the policy language, I cannot tell from

the summary judgment record whether plaintiff has actually received from defendant any ACV

payments for the claimed equipment, and if so, whether plaintiff has repaired or replaced the

equipment within a reasonable time.  Thus, I deny the motion to the extent plaintiff seeks

summary judgment on the RCV for the equipment losses.

DISCUSSION:  PREJUDGMENT INTEREST

      Plaintiff argues that it is entitled to recover prejudgment interest on its damages.  Plaintiff

contends that the exact amount of its losses has been ascertainable since November 16, 2009

when plaintiff filed its proof of loss and that as of January 16, 2010, defendant has defaulted on

its obligations to pay the required prejudgment interest.[7]  Additionally, plaintiff argues that

defendant owes plaintiff $110,250 for the prejudgment interest that accrued on the $700,000

defendant paid to plaintiff in September 2011.

      Under Oregon law, a court may award prejudgment interest only when the exact amount,

and the time from which interest should run, is ascertained or easily ascertainable.  Farhang v.

Kariminaser, 230 Or. App. 554, 556, 217 P.3d 218, 219 (2009).  However, "the fact that the

---

     [7]  Under Oregon Revised Statute § 742.238, in fire insurance policies, an insurer is
required to pay for covered losses within sixty days after the proof of loss is filed.

24 - OPINION & ORDER

amount owed cannot be ascertained without resolving complex issues of fact does not bar a determination that the defendant owed sums certain at a date certain." <u>Jones v. Dorsey</u>, 193 Or. App. 688, 692-93, 91 P.3d 762, 765 (2004).

In a 2002 case where the insureds alleged that the defendant insurer had breached their insurance contract by paying insufficient compensation to adequately repair roof damage, the Oregon Court of Appeals upheld the trial court's award of prejudgment interest despite the defendant's argument that "the amount owed was neither ascertained nor easily ascertainable because, first, plaintiffs submitted different amounts at different times before and during trial and, second, the amount plaintiffs ultimately pleaded differed from the amount defendant offered and both these amounts differed from the jury's determination." <u>Strader v. Grange Mut. Ins. Co.</u>, 179 Or. App. 329, 338, 39 P.3d 903, 908 (1992). Summarizing, the court stated: "Defendant, in other words, bases its argument entirely on the proposition that, unless the parties agree as to the amount of damages or the amount derives from the automatic application of an agreed-upon formula, prejudgment interest is improper." <u>Id.</u>

The <u>Strader</u> court explained that in Oregon, prejudgment interest is appropriate notwithstanding that a defendant disputes liability and the jury does not award plaintiff all the damages it sought or where "damages are not ascertainable until issues of fact have been decided by the jury[.]" <u>Id.</u> at 339, 39 P.3d at 909 (internal quotation marks omitted). As the court stated, "[p]ut another way, although there are questions of fact about the amounts owed, that does not mean that defendant did not owe sums certain at dates certain." <u>Id.</u> (internal quotation marks and brackets omitted).

Defendant contends that prejudgment interest is inappropriate because the value of the

25 - OPINION & ORDER

claimed damages is not readily ascertainable nor ascertainable by simple computation.

Defendant states that there was, and is, substantial and reasonable controversy over the damages

sustained in the loss. Defendant notes that plaintiff has submitted varying statements of damages

and inexact testimony about the losses. Defendant contends that the expert reports it submits in

opposition to the summary judgment motion indicate that plaintiff's documentation of its alleged

losses is incomplete. As to the $700,000 September 2011 payment, defendant argues that at no

time before that payment was made was the amount of loss without reasonable controversy and

thus, no prejudgment interest should be awarded.

 The motion for prejudgment interest is premature. Judge Papak recently encountered a

similar situation and first noted that "[i]n determining whether the amount of the damages and

starting date of the interest are ascertainable, [the court] do[es] not operate from the perspective

of the parties during litigation but from an objective, postjudgment perspective." Schnitzer Steel

Indus., Inc. v. Continental Cas. Co., No. CV 3:10–1174–PK, 2012 WL 3879276, at *19 (D. Or.

Mar. 9, 2012) (adopted in part, not adopted in part on other grounds, Judge Mosman, Sept. 5,

2012) (internal quotation marks omitted). In Judge Papak's case, the defendants contested the

plaintiff's claim for money damages on multiple grounds. Id. Questions of law and fact required

resolution before the plaintiffs' entitlement to damages could be established. Id. As a result,

Judge Papak denied the motion for prejudgment interest as premature, indicating that he would

reach the issue only after the plaintiff established the defendants' liability for money damages,

and whether those damages, and the dates on which they were incurred, could be readily

ascertained. Id..

 Here, although there may be no dispute regarding the valuations of various seed lots,

26 - OPINION & ORDER

defendants still contest whether a number of seed lots were actually lost in the fire.  Defendants

also contest whether several pieces of equipment were actually lost in the fire.  Thus, while

ultimately there may be no dispute as to the actual value of plaintiff's claims, meaning they were

readily ascertainable at some point before trial, it is premature to award prejudgment interest to

plaintiff when defendant challenges the very existence of some of the claimed assets.

Furthermore, as explained above, exactly what defendant paid for when it paid plaintiff $700,000

in September 2011 is unclear.  As a result, while Slack's report appears to have established ACV

and RCV for many pieces of equipment as early as April 2010, until the record establishes what

the payment was for and how defendant came to make the determination that $700,000 was

owed, I cannot say as a matter of law that plaintiff is owed prejudgment interest from the date

Slack's report was issued until the date in September 2011 when the $700,000 was paid.

Plaintiff's motion as to prejudgment interest is denied as premature.  Plaintiff may renew the

motion at a later date if appropriate.

   DISCUSSION:  DEFENDANT'S MOTION TO STRIKE PLAINTIFF'S EXPERTS

      Defendant moves to strike the proposed testimony of plaintiff's expert witnesses Robert

Halsey, Donald Myers, and John Poe,

I.  Robert Halsey

      Plaintiff hired Halsey to provide an opinion regarding the valuation of equipment lost in

the fire.  Pl.'s Daubert Hrg. Ex. 319.  Halsey has been employed in the seed industry for twenty-

seven years, seven years as the operator of a large grass seed processing facility.  Id.  He has

since worked for The Bratney Companies, a "sales, design and construction firm specializing in

the feed seed and grain industries[.]"  Id.  Halsey is the Territory Manager for Western Oregon

and Washington and has held this position for twenty years.  Id.  During that time, he has

developed, sold, and serviced over 300 customer accounts and has sold approximately $40

million in equipment, primarily in the seed industry.  Id.  Halsey has a Bachelor of Science

degree in Industrial Manufacturing from Oregon State University.  Id.

Halsey provided a "depreciated value" for pieces of equipment plaintiff lost in the fire.

Halsey does not appear to have valued every single piece of unscheduled and scheduled

equipment, but states that his spreadsheet shows the valuation of the equipment he is familiar

with, and is in the business of selling, as of the August 26, 2009 date of the fire.  Pl.'s Daubert

Hrg. Ex. 319.

Halsey's valuation opinion is based on the equipment description, his personal

observations and knowledge before the fire, the year purchased, and conversations with Kloft to

clarify the description and condition of the items.  Id.  He also reviewed manufacturer product

brochures and pricing lists of various equipment, purchase orders and invoices from Bratney

relating to the original sales as available, and spreadsheets of scheduled and unscheduled

equipment provided by plaintiff.  Id.  Valuation is based on the "purchased new" value of the

described equipment, with a deduction for age and condition.  Id.  His report includes a

"spreadsheet"[8] noting the equipment description, the original manufacturer, the market value at

the time of the fire, and the "percent of new."  Id.  The market value at the time of the fire is the

new price multiplied by the percentage listed.  Id.

_____

[8] This is not a typical spreadsheet, but an unnumbered listing of pieces of equipment in
no particular order which runs over portions of four pages.  The presentation is confusing and
makes it difficult to trace a single piece of equipment over the pages to review its description,
manufacturer, market value, and percentage.

28 - OPINION & ORDER

At the Daubert Hearing, Halsey testified that in determining the depreciated value for the equipment, he looked at what it would have cost to purchase the equipment new in the year of the fire, and then made an opinion on its value based on the condition of the particular machine and its age. In doing that, he considered the used market, with which he is familiar based on his work experience. As he explained, knowing used equipment values is integral to his job of selling new equipment. Halsey also relied on his experience to determine what the useful life is for a particular piece of equipment. He relied on his experience to determine that a particular machine, in its particular condition, was worth a certain percentage of the cost of a new machine.

Halsey has not had training in equipment valuation, has taken no formal classes on appraisal, and has no appraisal licensing. Ex. E to Jan. 23, 2013 Thenell Decl. (Halsey Dep.) at 16. He has not previously been retained as an expert witness in any matter. Id. at 10.

Defendant argues that while Halsey may be a fact witness at trial, he lacks the specialized or technical knowledge required to provide an expert opinion under Rule 702. Defendant further argues that because Halsey has done no research to determine if his valuation method was appropriate, his opinions are not properly grounded in reliable principles of appraisal and valuation.

I disagree. Halsey's years of experience in the agricultural equipment industry are sufficient under Rule 702(a) to provide him with specialized knowledge that will assist the trier of fact. Any objections about his lack of certification or training go to the weight of his testimony, not to its admissibility. Further, an expert may rely on his own experience in formulating his opinion, as long as the court finds it relevant and reliable. E.g., McKendall v. Crown Control. Corp., 122 F.3d 803, 807-08 (9th Cir. 1997) (expert opinion based on expert's

29 - OPINION & ORDER

engineering experience and prior investigations admissible as helpful, relevant and reliable even when the expert had not created or tested the safety device he opined would have prevented the accident), overruled on other grounds by Daubert, 509 U.S. 579; see also Alaska Rent-A-Car, Inc. v. Avis Budget Group, Inc., No. 10-35137, slip op. at 20 (9th Cir. Mar. 6, 2013) (noting that "the judge is supposed to screen the jury from unreliable nonsense opinions, but not exclude opinions merely because they are impeachable"); McClellan v. I-Flow Corp., 710 F. Supp. 2d 1092, 1138 (D. Or. 2010) (medical expert can rely on own clinical experience in stating opinion). Based on his experience, and his testimony at the Daubert Hearing, Halsey's opinion on the valuation of the equipment is sufficiently reliable, relevant, and helpful to testify at trial. Defendant's objections go to the weight of Halsey's testimony and are appropriate subjects for cross-examination.  They are not a basis for disqualifying Halsey.

II.  Donald Myers

Plaintiff hired Myers to provide an opinion on the value of pallets that were destroyed in the fire.  Myers has been employed for twenty-five years by the Bilet Products Company, a company that sells wooden pallets.  Pl.'s Daubert Hrg. Ex. 320.  Bilet has sold pallets to plaintiff since 2000.  Id.  In rendering his opinion, Myers reviewed plaintiff's file which Bilet maintained, as well as the files of other customers in the same industry.  Id.

Plaintiff purchased approximate 5,210 pallets sized 48" x 60" for an average price of $14.85 each.  Id.  Myers opines that in 2009, a used custom pallet of that size would be worth at least 55% of its original price, or $8.17.  Id.  He also valued other 48" x 40" shipping pallets that were not provided by Bilet, as selling for $8.00 each new in 2009, and $5.50 used in 2009.  Id.

At the Daubert Hearing, Myers testified that he buys used pallets daily, averaging 1,500

per day.  He sorts and grades the pallets into three categories depending on their condition.  In valuing plaintiff's loss, Myers relied on his experience in buying and selling pallets.  Myers explained that he knew plaintiff's pallets were storage pallets and having seen such pallets for years, he knew how they were used and what kind of condition they were likely in.  As a result, he knew what he might be able to do with such a pallet.

Myers also explained that his written report contained a math error by citing the $14.85 amount as the average when it was actually the last price paid.  He corrected the error and stated that the average was $13.01.  He further stated that there was a used market for both of the types of pallets he valued.

Defendant objects to Myers's testimony because Myers has no specialized knowledge of appraisal techniques.  And, because of the error in stating the wrong price for the average, defendant argues that the testimony is unreliable.

For the reasons explained above in connection with Halsey's testimony, I reject defendant's arguments which go to the weight, not the admissibility, of Myers's testimony.  Moreover, the math error was corrected and does not undermine his testimony.

III.  John Poe

In addition to the valuation claims at issue in this case, plaintiff brings a claim of breach of contract alleging that James King, defendant's captive insurance agent, failed to offer and obtain business interruption insurance coverage for plaintiff and as a result, plaintiff was damaged in an amount not less than $300,000.  First Am. Compl. at ¶¶ 47-54 (Third Claim for Relief, Count 1).  Plaintiff brings an almost identical claim, but based on a theory that King breached the implied covenant of good faith and fair dealing.  Id. at ¶¶ 62-69 (Third Claim for

31 - OPINION & ORDER

Relief, Count 3).

In support of these claims, plaintiff intends to offer the expert testimony of John Poe who was retained "to provide an opinion as to the standard in the industry with respect to captive insurance agents in offering insurance coverages to an insured." Pl.'s Daubert Hrg. Ex. 322 at 1. In addition, he was asked to provide an opinion as to the coverage that should have been available to plaintiff for business interruption. Id. In Poe's opinion, "an insurance agent in Oregon that sells policies to insure businesses or who sells 'Business Policies' is acting below the standard of care if they do not offer Business Interruption Coverage." Id. at 3. King, in Poe's opinion, fell below this standard of care by not offering plaintiff business interruption coverage. Id.

Defendant argues that Poe's testimony is inadmissible because Poe lacks the specialized knowledge and experience necessary to offer opinions on insurance agent duties in Oregon and he does not reliably apply principles and methods to the facts of the case. As I suggested at the Daubert Hearing, I have a more fundamental problem with Poe's testimony: his testimony will not assist the trier of fact to understand the evidence or to determine a fact in issue because the business interruption claims on which his testimony is offered are without merit.

In the supplemental briefing I allowed on this issue at the conclusion of the Daubert Hearing, plaintiff contends that its breach of contract claim asserts that (1) a contract existed between plaintiff and defendant in July and August 2009 under which defendant undertook the responsibility to recommend and procure insurance for plaintiff; (2) part of that contract required defendant, through King, to use such skill as would be normally expected of insurance agents in Oregon; (3) defendant, through King, failed to use that skill by failing to recommend business

32 - OPINION & ORDER

interruption coverage, thereby breaching the contract to procure insurance; and (4) plaintiff suffered a loss because defendant failed to perform its obligations under the contract to procure insurance.  Pl.'s Supp'l Mem. on Daubert Challenge to Poe at 2-3.

Plaintiff, however, does not make those allegations in its First Amended Complaint. Instead, plaintiff alleges that (1) in July and August 2009, it "directed that King . . . recommend and obtain insurance coverage suitable to fully cover Plaintiff's business in case of loss by, among other things, fire"; (2) King "failed to obtain any business interruption coverage"; (3) had defendant offered such coverage, plaintiff would have purchased it; and (4) as a direct and proximate result of defendant's failure to recommend and procure insurance, plaintiff incurred damages.  First Am. Compl. at ¶¶ 49-53.

Notably absent from these allegations are words such as "contract," "agreement," "meeting of the minds," "consideration," "obligation," "terms," or other words indicating a contractual relationship and obligations or provisions.  To establish a claim for breach of contract, "plaintiff must allege the existence of a contract, its relevant terms, plaintiff's full performance and lack of breach and defendant's breach resulting in damage to plaintiff."  Slover v. Or. State Bd. of Clinical Soc. Workers, 144 Or. App. 565, 570, 927 P.2d 1098, 1101 (1996) (internal quotation marks omitted).  Here, even under the liberal notice pleading standards allowed in federal court, see Fed. R. Civ. P. 8(a)(2), plaintiff fails to state a breach of contract

claim.[9]  Instead, this is a tort claim disguised as a contract claim.[10]

Additionally, even if the contract claim had been adequately pleaded, and aside from what I believe will be considerable proof problems, the claim cannot survive in the presence of the merger clause in the commercial policy that defendant issued to plaintiff.  The Common Policy Conditions of the commercial policy provide that "[t]his policy contains all the agreements between you and us concerning the insurance afforded." Ex. 1 to July 12, 2012 Kloft Decl. at 11. Plaintiff argues that this clause has no effect on its business interruption claims because those claims are about an entirely different contract:  one to procure insurance.  According to plaintiff, the merger clause incorporates agreements related to the specific insurance covered by the policy that actually issued and does not relate to other independent contracts.

While I agree with plaintiff's statement generally, the problem here is that the commercial policy issued to plaintiff included $25,000 in business interruption coverage.  Id. at 50.  The effect of the merger clause, then, is that the written terms of the actual policy with the $25,000 in business interruption coverage cannot be varied by a prior oral agreement related to business interruption coverage.   All such agreements have been merged into the written document.

_____

[9]  Because plaintiff fails to sufficiently plead the existence of a contract, plaintiff also fails to state a claim for breach of the implied duty of good faith and fair dealing.  See Davis v. Pacific Saw & Knife Co., No. 03:08-cv-00676-HU, 2008 WL 4319981, at *2 (D. Or. Sept. 16, 2008) (in the absence of a contract between the plaintiff and the defendant, a plaintiff cannot bring a claim for breach of the covenant of good faith and fair dealing).

[10]  Oregon does not recognize negligence-based claims regarding the provision of insurance brought against captive insurance agents because captive agents act on behalf of the insurer not the insured.  See Lewis-Williamson v. Grange Mut. Ins. Co., 179 Or. App. 491, 495, 39 P.3d 947, 949-50 (2002); see also Prudential Prop. & Cas. Ins. Co. v. Lillard-Roberts, No. 03:01-cv-01362-ST, 2002 WL 31495830, at *16 (D. Or. June 18, 2002) ("A captive insurance agent has no special duty to a policyholder to support a tort claim").

Plaintiff's business interruption claims cannot survive.

Finally, independent of the validity of the claim, Poe's testimony would not be helpful to the trier of fact because the concept of the standard or duty of care is a tort concept, not one arising in contracts. See Murphy v. Allstate Ins. Co., 251 Or. App. 316, 327-28, 284 P.3d 524, 532 (2012) (when claim is based solely on a breach of a provision in the contract, provision itself spells out the party's obligation; negligence claim implicates a standard of care independent of the contract). Here, assuming the claim is otherwise valid, plaintiff would have to establish that the contract terms themselves set forth a particular duty of care and additionally would have to show that Poe's testimony would assist the trier of fact in determining whether a breach of that duty had occurred. Because Poe's testimony is generally about the industry standard of care for an insurance agent in offering and obtaining insurance, and is not an opinion about any standard of care the in this putative contract to procure insurance, it has no relevance to the claims plaintiff attempts to allege. I sustain defendant's objection to Poe's testimony.

My review of the breach of contract and duty of good faith claims related to the business interruption coverage has occurred in the context of defendant's challenge to Poe's testimony under Rule 702.[11] As should be clear, however, I find no merit in the claims. Accordingly, because the parties were on notice regarding the concerns raised about these claims and had the opportunity to file supplemental briefing, I dismiss the breach of contract and breach of the implied duty of good faith and fair dealing claims related to the failure of King to offer and

---

[11] Defendant apparently interpreted my allowing the parties to continue discovery after the discovery cutoff as allowing dispositive motions to be filed after the dispositive motion deadline. As explained in my January 29, 2013 Order, that interpretation was incorrect. As a result, even though defendant intended to move for summary judgment against these claims, it failed to timely do so.

35 - OPINION & ORDER

procure business interruption insurance.  Fed. R. Civ. P. 56(f).

CONCLUSION

Plaintiff's motion for partial summary judgment [47] is denied and plaintiff's objections to defendant's experts are overruled.  Defendant's motion to strike plaintiff's experts [114] is denied as to Halsey and Myers and is granted as to Poe.  Counts 1 and 3 of plaintiff's Third Claim for Relief are dismissed.

IT IS SO ORDERED.

Dated this ____11____ day of ____March____, 2013

_____
MARCO A. HERNANDEZ
United States District Judge