IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PRECISION SEED CLEANERS,
an Oregon corporation,

                Plaintiff,                    No. 03:10-cv-01023-HZ

      v.

COUNTRY MUTUAL INSURANCE           OPINION & ORDER
COMPANY, a foreign business
corporation,

                Defendant.

Douglas M. Bragg
Frederick M. Millard
MILLARD & BRAGG ATTORNEYS AT LAW P.C.
6650 SW Redwood Lane
Suite 330
Portland, Oregon 97224

Robert E.L. Bonaparte
SHENKER & BONAPARTE
1500 S.W. First Avenue, Suite 765
Portland, Oregon 97201

      Attorneys for Plaintiff

1 - OPINION & ORDER

Daniel E. Thenell
Jillian M. Hinman
THENELL LAW GROUP, PC
12909 SW 68th Parkway, Suite 320
Portland, Oregon 97223

      Attorneys for Defendant

HERNANDEZ, District Judge:

      Plaintiff Precision Seed Cleaners brought this action against Defendant Country Mutual

Insurance Company seeking payment for inventory and property destroyed in a fire.  The parties

settled the substantive issues in the case shortly before trial, leaving the issues of attorney fees

and prejudgment interest for the Court.

      Plaintiff seeks $1,159.223.19[1] in attorney fees and $944,772.50 in prejudgment interest.

For the reasons explained below, I grant the motion in part and deny it in part and award Plaintiff

$539,443.20 in attorney fees and $148,671.55 in prejudgment interest.

I.  Entitlement to Fees

      State law governs attorney fees in diversity cases.  <u>Riordan v. State Farm Mut. Auto. Ins.</u>

<u>Co.</u>, 589 F.3d 999, 1004 (9th Cir. 2009) ("In a diversity case, the law of the state in which the

district court sits determines whether a party is entitled to attorney fees, and the procedure for

requesting an award of attorney fees is governed by federal law") (internal quotation marks

omitted).  Generally, "a court awards attorney fees to a litigant only if a statute or contract

authorizes such an award."  <u>Swett v. Bradbury</u>, 335 Or. 378, 381, 67 P.3d 391, 392 (2003).

      Plaintiff seeks attorney fees pursuant to Oregon Revised Statute § (O.R.S.) 742.061

---

    [1]  In its motion, Plaintiff states the amount as $1,159.223.10, but when the subtotals on
page three of the motion are added together, the amount is $1,159.223.19.  Pl.'s Mtn at 2, 3.

which provides, in relevant part:

> [I]f settlement is not made within six months from the date proof of loss is filed
> with an insurer and an action is brought in any court of this state upon any policy
> of insurance of any kind or nature, and the plaintiff's recovery exceeds the amount
> of any tender made by the defendant in such action, a reasonable amount to be
> fixed by the court as attorney fees shall be taxed as part of the cost of the action
> and any appeal thereon.

O.R.S. 742.061(1).  The purpose of the statute is to encourage settlement of insurance claims

without litigation.  Hennessy v. Mut. of Enumclaw Ins. Co., 229 Or. App. 405, 409, 211 P.3d

325, 327 (2009).

The plain language of the statute sets forth four conditions for entitlement to attorney

fees:  (1)  Plaintiff must have filed a proof of loss with its insurer; (2) settlement must not have

occurred within six months of filing of that proof of loss; (3) Plaintiff must have brought a court

action upon the policy; and (4) Plaintiff must have ultimately recovered more than the amount of

any tender made by Defendant in the action.  If the conditions in the statute are met, "the decision

whether to grant attorney fees is not a discretionary one.  Instead, when the statutory conditions

are met, the court 'shall' award attorney fees."  Petersen v. Farmers Ins. Co. of Or., 162 Or. App.

462, 466, 986 P.2d 659, 661 (1999).

The fire occurred on August 26, 2009 and Plaintiff promptly reported it to Defendant.

Within hours, Defendant sent adjustors, investigators and its attorney to the scene.  Various law

enforcement agencies also investigated the fire.  On or about November 13, 2009, Plaintiff

provided a written, sworn statement to Defendant claiming $5,800,917.70 in losses.  Ex. 1 to Jan.

25, 2013 Thenell Decl. (Dkt #119); Frenette Decl. at ¶ 24 (Dkt #121).  Defendant had concerns

regarding the veracity of the purported losses.  In mid-December 2009, Defendant told Plaintiff

3 - OPINION & ORDER

that Defendant may require documents and an Examination Under Oath (EUO) as part of its investigation of the claim. Ex. 2 to Jan. 25, 2013 Thenell Decl.

Plaintiff was initially represented by Donald M. Kelley, Plaintiff's corporate counsel. On December 29, 2009, Defendant wrote to Kelley requesting documents in advance of the EUO. Ex. 3 to Jan. 25, 2013 Thenell Decl. On January 29, 2010, Defendant again wrote to Kelley to request the documents and to reiterate that Defendant had not made a coverage determination and that its investigation was continuing. Ex. 4 to Jan. 25, 2013 Thenell Decl.

On February 15, 2010, Plaintiff's current counsel Fred Millard wrote to Defendant to state that he had been retained to represent Plaintiff. Ex. 5 to Jan. 25, 2013 Thenell Decl. Through Millard, Plaintiff indicated that it would compile and deliver to Defendant the documents that Defendant had requested and would be reviewing its previously submitted November 13, 2009 proof of loss statement to determine if any changes needed to be made. Id. Plaintiff asked Defendant to identify the individuals Defendant wished to examine in an EUO. Id. Plaintiff also asked for a copy of the insurance policy and other documents. Id.

Defendant provided the policy and other requested documents to Plaintiff on February 26, 2010 and March 10, 2010. Exs. 6, 7 to Jan. 25, 2013 Thenell Decl. In its March 10, 2010 letter, Defendant requested additional documents from Plaintiff. Ex. 7 to Jan. 25, 2013 Thenell Decl. Also on March 10, 2010, Defendant received a report from its own expert opining that the cause of the fire was undetermined. Jan. 25, 2013 Thenell Decl. at ¶ 11. On March 25, 2010, Defendant reminded Plaintiff that the claim remained under investigation, that no coverage determination had been made, and that Defendant was still awaiting documents from Plaintiff. Ex. 8 to Jan. 25, 2013 Thenell Decl. Defendant noted that it could not schedule the EUOs until it

obtained the requested documents.  Id.

On May 4, 2010, Defendant acknowledged recently receiving eleven binders of documents from Plaintiff.  Ex. 13 to Jan. 25, 2013 Thenell Decl.  Defendant then scheduled the EUOs of three individuals for June 10 and 11, 2010.  Id.  The day before the EUOs were to start, Plaintiff notified Defendant that the losses sustained amounted to $4,543,317.20, not the $5,800,917.70 originally claimed.  See Ex. 14 to Jan. 25, 2013 Thenell Decl. (June 9, 2010 letter from Plaintiff and indicating that several "Replacement Schedules" itemizing the property losses were enclosed).  The initial EUO of Paul Kloft was conducted on June 11, 2010, and was continued on August 31, 2010.  Jan. 25, 2013 Thenell Decl. at ¶¶ 20, 21.  Plaintiff filed this action on August 31, 2010, seeking $4,965,659 in claimed losses, and bringing claims for breach of contract, breach of the implied covenant of good faith and fair dealing, intentional interference with economic relationships, and failure to obtain insurance coverage.

In June 2011, Defendant requested that the parties participate in mediation and expressed the desire to reach a settlement.  Ex. 1 to July 25, 2013 Thenell Decl. (Dkt # 239).  In August 2011, Plaintiff requested that Defendant stipulate to Plaintiff filing an amended complaint.  Ex. 2 to July 25, 2013 Thenell Decl.  Plaintiff also indicated that once issues relating to third parties (equipment lessors and seed of others) were resolved, Plaintiff would be willing to participate in a settlement conference.  Ex. 3 to July 25, 2013 Thenell Decl.  Plaintiff then told Defendant that it would not agree to stay the litigation and participate in settlement negotiations unless Defendant paid $1 million toward the claim.  Ex. 4 to July 25, 2013 Thenell Decl.

On August 16, 2011, Defendant offered Plaintiff $700,000 toward partial settlement if Plaintiff agreed to stay the litigation during settlement negotiations.  Ex. 5 to July 25, 2013

Thenell Decl.  An agreement was reached on August 26, 2011.  Id.  On August 31, 2011, the

Court granted a motion to stay litigation for sixty days and strike all deadlines.  Settlement at that

time was unsuccessful and the litigation resumed in November 2011.  Eventually, Plaintiff

settled the case in April 2013 for a total of $3,320,000, inclusive of the $700,000 Defendant paid

in August 2011 and exclusive of attorney fees and prejudgment interest.

 For the purposes of O.R.S. 742.061, "proof of loss" is "any event or submission that

would permit an insurer to estimate its obligations[.]"  Dockins v. State Farm Ins. Co., 329 Or.

20, 29, 985 P.2d 796, 801 (1999).  "'[A]ny event or submission that would permit an insurer to

estimate its obligations (taking into account the insurer's obligation to investigate and clarify

uncertain claims) qualifies as 'proof of loss' for the purposes of [O.R.S. 742.061].'"  Parks v.

Farmers Ins. Co. of Or., 347 Or. 374, 382-84, 227 P.3d 1127, 1131-32 (2009) (insured's phone

call to insurance agent reciting the amounts he paid and expected to pay to clean up

contamination constituted a proof of loss) (quoting Dockins, 329 Or. at 29, 985 P.2d 796)

(second brackets in Parks).  The proof of loss does not require that the insured calculate the loss

with sufficient specificity to enable the insurer to make a settlement offer.  Dockins, 329 Or. at

30, 985 P.2d at 801 (complaint seeking remediation costs in excess of $6,000 in an amount to be

proved at trial constituted a proof of loss).  Rather, "the question is whether the insurer could

have made the necessary calculation had it made a reasonable inquiry."  ZRZ Realty Co. v.

Beneficial Fire & Cas. Ins. Co., 222 Or. App. 453, 494, 194 P.3d 167, 190 (2008) (insured's letter

to insurer stating that the Oregon Department of Environmental Quality named it a potentially

responsible party for a contamination site constituted a proof of loss despite that it did not specify

defense costs), aff'd in part, rev'd in part on other grounds, 349 Or. 117, 241 P.3d 710 (2010).

6 - OPINION & ORDER

Plaintiff argues that the August 26, 2009 inspection of the property by Defendant's agents and counsel the day after the fire satisfies the statute's "proof of loss" requirement. Alternatively, Plaintiff relies on the August 31, 2010 Complaint as the operative proof of loss. Defendant does not address Plaintiff's argument that the August 26, 2009 inspection of the property can be considered a proof of loss under O.R.S. 742.061. I need not decide the issue because the Complaint filed in this case satisfies the statutory proof of loss requirement and Defendant made no settlement offer until more than six months after the Complaint was filed.

The Complaint alleged that Plaintiff had an insurance policy with Defendant insuring the building, business personal property, equipment, and various leased equipment and property belonging to third parties. Compl. at ¶¶ 8-9. Plaintiff further alleged that as a result of the fire, which occurred when the policy was in force, Plaintiff suffered losses from (1) fire and smoke damage to the building and equipment, (2) fire, smoke, heat, and water damage to its business personal property; and (3) smoke and fire damage to the third party property. Id. at ¶¶ 10-11. Plaintiff alleged that Defendant had been promptly notified of the loss and damage, that Plaintiff had provided Defendant with a sworn proof of loss statement in November 2009, and that as of August 26, 2010, Defendant had failed to provide Plaintiff notice of its intentions as required under the policy and had failed to pay the claim. Id. at ¶¶ 12-15. Plaintiff also alleged that it had performed all of its obligations under the policy and had, and continued to, cooperate with the investigation of the loss. Id. at ¶¶ 16-17. It alleged that it had incurred over $4 million in damages. Id. at ¶ 18. It also alleged that as a result of its business interruption, it had incurred, and continued to incur, ongoing business interruption and lost profit damages in an amount to be proven at trial. Id. at ¶ 19. Moreover, more than two months before the Complaint was filed,

Plaintiff had sent Defendant its revised itemized lists of lost property.  It is clear from the caselaw cited above that this Complaint satisfied the statutory proof of loss requirement.

Defendant's first settlement offer was not until August 2011, more than six months after the Complaint was filed.  Although Defendant subsequently made various settlement offers during the pendency of the litigation, Plaintiff ultimately recovered more than the amount of any prior tender made by Defendant.  And, in this case, where no tender at all was made during the first six months after the triggering event, all of Defendant's subsequent tenders are considered "untimely" and thus cannot defeat Plaintiff's right to attorney fees under O.R.S. 742.061.  See Dockins, 329 Or. at 33, 985 P.2d at 803 ("Unless and until the legislature decides to provide otherwise, only a timely tender . . . can defeat a prevailing insured's right to attorney fees. . . . [Where] the filing of the insured's complaint is deemed to be the 'proof of loss,' that means that [the insurer] had six months from the date of service of the complaint in which to make a tender, i.e., an unconditional offer to pay money"); Petersen, 162 Or. App. at 465, 986 P.2d at 660 ("for a defendant's tender to defeat a plaintiff's right to attorney fees under the statute, the tender must be a 'timely' one.  To be 'timely,' the tender must be made within six months after the filing of the proof of loss with the insurer.") (citation omitted).

Defendant argues that Plaintiff is not entitled to fees under O.R.S. 742.061 because Plaintiff failed to cooperate with Defendant's investigation.  Defendant acknowledges that "the trend in controlling" Oregon cases addressing O.R.S. 742.061 has been one of broad interpretation in favor of policyholders.  Def.'s Opp'n Mem. at 14.  Nonetheless, Defendant argues that the current case law has not answered the question of whether an insured can recover attorney fees under the statute when the insured's failure to cooperate prevents the insurer from

8 - OPINION & ORDER

investigating the claim.

Although I disagree with Defendant that this is an open question under Oregon law, I reject its argument because the record does not support its assertion that Plaintiff failed to cooperate in the investigation, especially when the Complaint is considered to be the actionable proof of loss triggering entitlement to fees.  As to the legal issue, and as noted above, Oregon case law indicates that when the conditions of O.R.S. 742.061 are met, a fee award is mandatory, not discretionary.  E.g., Or. Realty Co. v. Greenwich Ins. Co., No. 3:12–cv–00200–MO, 2013 WL 3287092, at *2 (D. Or. June 28, 2013) (once the court finds that "the conditions of the statute are met, the award pursuant to the statute is not discretionary"), amended on reconsideration on other grounds, 2013 WL 4859305 (D. Or. Sept. 11, 2013).  Here, because the record establishes that Plaintiff submitted to Defendant a proof of loss or its equivalent within the meaning of O.R.S. 742.061 as interpreted by the Oregon courts, and that no tender was made by Defendant within six months of that submission, the statute directs an award of fees.

Defendant argues that it promptly began its investigation into the claim upon the initial report of loss and sought Plaintiff's cooperation by requesting the EUOs and documents in support of the value of the claim.  Plaintiff submitted a sworn statement of itemized losses on November 13, 2009, only a couple of months after the fire.  Defendant first requested documents from Plaintiff in late December 2009 and added additional document requests in March 2010.  In its initial request, Defendant sought thirteen different categories of documents including multiple years of certain types of documents such as balance sheets, ledgers, receipts, log books, and bank statements.  Ex. 3 to Jan. 25, 2013 Thenell Decl.  In its March 2010 request, Defendant added three types of documents specific to forklifts and physical inventories.  Ex. 7 to Jan. 25, 2013

9 - OPINION & ORDER

Thenell Decl.  Given the volume of documents requested and the fact that Plaintiff switched from corporate counsel to litigation counsel in February 2010, Plaintiff's late April-early May 2010 response to Defendant's document requests does not indicate a lack of cooperation.

Defendant stated that it would schedule the EUOs <u>after</u> it received the requested documents.  Ex. 8 to Jan. 25, 2013 Thenell Decl.  Given that the production of the documents was not unreasonably untimely, the fact that the EUOs occurred in the late spring and summer of 2010 also does not indicate that Plaintiff was uncooperative in the investigation.  Defendant chose the EUO dates and while Paul Kloft's EUO had to be continued approximately six weeks, it began on the date Defendant designated.

Defendant suggests that Plaintiff's filing of this action on the date of Paul Kloft's continued EUO, and the fact that the Complaint included tort claims, evidences Plaintiff's failure to cooperate with Defendant's investigation.  While the filing of the Complaint and its inclusion of non-contract claims may have complicated Defendant's investigation and litigation strategy, I do not agree that the initiation of litigation exposes uncooperative conduct by Plaintiff.

Defendant also suggests that Plaintiff's excessive claimed losses, and the fact that Plaintiff lowered its losses by approximately $1.4 million in June 2010, prevented Defendant from ascertaining its obligations.  I disagree.  First, the amount of the claimed losses does not relate to the initial coverage issue which was being investigated by Defendant's own origin expert during late 2009 until March 10, 2010.  Second, when Plaintiff revised its claimed losses in June 2010, it provided Defendant itemized schedules of the alleged lost property, just as it had the prior November.  While Defendant believes that Plaintiff's claim was not credible, both as to the existence and value of certain property, Plaintiff's June 2010 revised itemized schedules certainly

10 - OPINION & ORDER

gave Defendant plenty of information from which Defendant could "ascertain its obligations."

Third, by the time the Complaint was filed, Defendant had conducted the EUOs.  With the

Complaint considered the triggering proof of loss under O.R.S. 742.061, Defendant already had

in its possession the initial November 2009 proof of loss, eleven binders of requested documents,

the revised June 2010 itemized schedules, and had completed the EUOs.  Defendant's argument

that Plaintiff failed to cooperate in the investigation preventing Defendant from making a

settlement within six months of the August 31, 2010 Complaint is not supported by the record.

Finally, Defendant alternatively argues that even if attorney fees are directed by O.R.S.

742.061, they should be denied under the factors in O.R.S. 20.075(1).  However, as other Judges

in this District have explained, when an attorney fee award is mandated by O.R.S. 742.061, the

factors of O.R.S. 20.075(1) do not apply to the analysis of <u>whether</u> to award fees.  <u>Or. Realty Co.</u>,

2013 WL 3287092, at *2 (because the conditions of O.R.S. 742.061 were met, O.R.S. 20.075(1)

was relevant to the amount of fees but not to whether to award fees); <u>McCormick & Schmick's</u>

<u>Seafood Rest., Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh</u>, No. 03:08-cv-01011-AA, 2011 WL

4625728, at *3 (D. Or. Sept. 30, 2011) (after determining that the plaintiff was entitled to fees

under O.R.S. 742.061, court evaluated reasonableness of fee request using factors O.R.S.

20.075(1)).

II.  Amount of Fees

Plaintiff seeks $680,698.50 for time spent by Millard & Bragg attorneys and staff on the

substantive part of the case, along with a 1.5 multiplier of $340,349.25 for this work.  Pl.'s Mtn.

at 3.  Additionally, Plaintiff seeks $24,116 for time spent by Millard & Bragg in the attorney fee

phase of the case, $86,546.50 for time spent by Shenker & Bonaparte in the attorney fee phase of

the case, and $7,464.25 for time spent by Kelley & Kelley.  Id.  Finally, Plaintiff seeks

$20,048.69 in expenses, for a total award of $1,159,223.19.  Id.  Defendant contends that

Plaintiff's request is unreasonable.

> Under [O.R.S. 742.061], "'reasonableness,' not a particular formula, [is] the
> lodestar for an award of attorney fees to an insured who prevails in a policy claim
> against his or her insurer."  Country Mut. Ins. Co. v. White, 212 Or. App. 323,
> 333, 157 P.3d 1212, 1217 (2007).  Reasonableness depends "on the totality of the
> criteria prescribed by ORS 20.075."  G.A.S.P. v. Envtl. Quality Comm'n of the
> State of Or., 222 Or. App. 527, 547, 195 P.3d 66, 77 (2008).

Malbco Holdings, LLC v. AMCO Ins. Co., No. 03:08-cv-00585–ST, 2010 WL 2572849, at *1

(D. Or. June 22, 2010); see also Alexander Mfg. Inc. Emp. Stock Ownership Plan & Trust, v. Ill.

Union Ins. Co., 688 F. Supp. 2d 1170, 1181 (D. Or. 2010) (reasonableness of an attorney fee

award is determined by the factors in ORS 20.075).

O.R.S. 20.075 provides:

(1) A court shall consider the following factors in determining whether to award
attorney fees in any case in which an award of attorney fees is authorized by
statute and in which the court has discretion to decide whether to award attorney
fees:

> (a) The conduct of the parties in the transactions or occurrences that gave
> rise to the litigation, including any conduct of a party that was reckless,
> willful, malicious, in bad faith or illegal.

> (b) The objective reasonableness of the claims and defenses asserted by
> the parties.

> (c) The extent to which an award of an attorney fee in the case would deter
> others from asserting good faith claims or defenses in similar cases.

> (d) The extent to which an award of an attorney fee in the case would deter
> others from asserting meritless claims and defenses.

> (e) The objective reasonableness of the parties and the diligence of
> the parties and their attorneys during the proceedings.

12 - OPINION & ORDER

(f) The objective reasonableness of the parties and the diligence of the parties in pursuing settlement of the dispute.

(g) The amount that the court has awarded as a prevailing party fee under ORS 20.190.

(h) Such other factors as the court may consider appropriate under the circumstances of the case.

(2) A court shall consider the factors specified in subsection (1) of this section in determining the amount of an award of attorney fees in any case in which an award of attorney fees is authorized or required by statute. In addition, the court shall consider the following factors in determining the amount of an award of attorney fees in those cases:

(a) The time and labor required in the proceeding, the novelty and difficulty of the questions involved in the proceeding and the skill needed to properly perform the legal services.

(b) The likelihood, if apparent to the client, that the acceptance of the particular employment by the attorney would preclude the attorney from taking other cases.

(c) The fee customarily charged in the locality for similar legal services.

(d) The amount involved in the controversy and the results obtained.

(e) The time limitations imposed by the client or the circumstances of the case.

(f) The nature and length of the attorney's professional relationship with the client.

(g) The experience, reputation and ability of the attorney performing the services.

(h) Whether the fee of the attorney is fixed or contingent.

O.R.S. 20.075.

    A.  Subsection (1) Factors

Defendant argues that an analysis of the subsection (1) factors shows that any attorney fee

award to Plaintiff should be limited.  Defendant argues that Plaintiff failed to cooperate in the investigation of the claim and failed to engage in "earnest discussion" about the loss amounts which could actually be substantiated, both of which prevented resolution of the claim without need for litigation.  Defendant also argues that several of Plaintiff's claims were objectively unreasonable, that an award of attorney fees would dissuade insurance companies from exercising their duty to investigate insurance claims for potential fraud and to ensure claims are supported, and that Plaintiff's conduct during litigation was unreasonable as exemplified by Plaintiff's presentation of many allegedly large and mostly unsuccessful motions late in the litigation and its attempts to "bully" Defendant into paying all of Plaintiff's losses without regard to the fact that it was Plaintiff's burden to prove those losses.  Finally, Defendant argues that Plaintiff was not objectively reasonable in rejecting Defendant's numerous offers to settle the litigation.

Plaintiff characterizes Defendant's conduct differently, contending that Defendant challenged issues which it knew would be resolved in Plaintiff's favor, changed the basis of its defense multiple times during the litigation, had a "fluid" approach to expert discovery unsupported by local rules or applicable rules of civil procedure, and wasted time at the August 2012 settlement conference by not being prepared.

Based on the record, and my observation of the conduct of the parties and their counsel during this litigation, I find that both parties, and counsel for both parties, bear equal responsibility for the conduct that gave rise to the litigation and the positions taken on issues during the litigation.  At various times, each of the parties engaged in conduct or took positions that needlessly prolonged the litigation.  Although I have already determined that Plaintiff did not

fail to cooperate in the initial investigation of the claim before it filed this action, it may have

been prudent for Plaintiff to have waited until Defendant had finished its investigation before

commencing litigation.  There is no doubt that adding tort claims to the Complaint complicated

the defense, especially when some of the claims were highly unlikely to succeed.  Plaintiff also

jumped the gun by filing its motion for summary judgment related to the value of its claims in

July 2012 almost two months before the dispositive motion deadline and at a time when expert

discovery on valuation was still ongoing.

 However, Defendant's conduct forced Plaintiff to file more than one motion that

Defendant later conceded, Defendant initially asserted as affirmative defenses that Plaintiff's

claim was barred by policy provisions regarding cooperation, misrepresentation, and fraud, and

then withdrew those defenses more than one year later, and Defendant failed to appreciate the

significance of certain Court deadlines.

 I offer these as examples of why both parties bear responsibility for driving up the costs

of this litigation.  It does not appear that counsel for either party was doing his best work.  I

strongly believe that underlying much of the needless prolonging of the case was a failure of

counsel to effectively communicate with each other in a way that could have narrowed the issues.

As a result, the subsection (1) factors do not cause me to adjust otherwise reasonable attorney

fees in favor of either party.

 B.  Subsection (2) Factors

 The subsection (2) factors require me to look at the fee customarily charged in the

community for similar legal services and the experience, reputation, and ability of any attorney

performing services as well as various other factors used to assess the reasonable number of

15 - OPINION & ORDER

hours and the overall reasonableness of the fee.  Initially, I find that in regard to subsection

(2)(b), the record does not support Plaintiff's assertion that the case required Plaintiff's counsel to

deprive himself and his firm of his service.  Pl.'s Mem. at 20 (citing Bragg Decl. at ¶¶ 3, 8).

Although Plaintiff's counsel states that the case took three years to litigate and involved several

thousand pages of discovery along with 500 photographs, that establishes only the size and

length of the case and not the likelihood that the acceptance of the case would, or did, preclude

Plaintiff's counsel from taking other cases.  Millard notes that Millard & Bragg is a small firm

and that from July 2012 to present, Plaintiff's counsel devoted substantial time and effort to this

case to the exclusion of other cases.  Millard Decl. at ¶ 5c.  Nonetheless, the statute focuses on

the "likelihood, if apparent to the client, that the acceptance of the particular employment by the

attorney would preclude the attorney from taking other cases." O.R.S. 20.075(2)(b) (emphasis

added).  Plaintiff fails to show that it was aware that counsel's acceptance of the case would

preclude counsel from taking on other cases.

As to subsection (2)(d), Plaintiff sought more than $4.9 million in contract-based

damages and settled for just over $3.2 million.  However, considering that Plaintiff also sought

additional tort damages of at least $700,000 plus punitive damages, Am. Compl.; Exs. 9, 10 to

Thenell July 25, 2013 Decl., Plaintiff obtained perhaps fifty-percent of the total amount it sought.

The result obtained is favorable, but not overwhelmingly so.  The record provides no information

to assess the factors in subsections (2)(e) and (f).  And, as to subsection (2)(h), while Plaintiff

took the case on a contingency basis, once six months passed without a settlement offer of any

kind from Defendant, Plaintiff knew that if it settled for any amount whatsoever, it would be

entitled to attorney fees under O.R.S. 742.061, reducing the impact of the contingent nature of

16 - OPINION & ORDER

the case.

    1.  Subsections (2)(c) and (2)(g) - Reasonable Hourly Rates

Subsections (2)(c) and (2)(g) require analysis of the fee customarily charged in the

locality for similar services and the experience, reputation, and ability of the attorney performing

the services.  Both are relevant to determining a reasonable hourly rate.

    a.  Attorneys

Plaintiff seeks the following hourly rates for its attorneys:  (1) Fred Millard:  $400; (2)

Douglas Bragg:  $350; (3) Chris Fanning:  $250; (4) Donald Kelley:  $215; (5) Kristen Ennis:

$165; (6) Robert Bonaparte:  $450.  Plaintiff provides information as to the background and

experience of these attorneys and also relies on the Amended Declaration of David Markowitz

and the Declarations of Bragg, Millard, Kelley, and Bonaparte.  Defendant objects to several of

the requested hourly rates and relies on the Declaration of William Stockton in support of its

objections.

    i.  Millard

Millard seeks $400 per hour for all hours spent on the case starting from February 2010 to

present.  He has been an active member of the Oregon State Bar for just under fifteen years and

initially spent approximately six months as a construction litigator and eighteen months as a

public defender.   Millard Decl. at ¶¶ 1 - 1d.  In June 2000, he began working as a solo

practitioner specializing in construction and insurance litigation.  Id. at ¶ 1e.  In addition to the

Oregon State Bar, he is admitted to practice in Washington as well this District and the Ninth

Circuit.  Id.

Markowitz opines that a reasonable rate for Millard is $350 per hour.  Markowitz Am.

17 - OPINION & ORDER

Decl. at ¶ 10a.  He states that Millard is the lead partner in a respected regional boutique trial firm with many years of experience in insurance coverage and other litigation.  Id. at ¶ 11. Markowitz also states that Millard is respected by leading members of the defense bar in the area of first party insurance coverage, particularly in fire loss litigation.  Id. at ¶ 13.  Markowitz notes that in April 2012, Judge Brown awarded Millard $300 per hour, but Markowitz states that since that award, Millard has continued to build his focused practice of fire loss litigation and other insurance coverage litigation, suggesting that the higher rate Millard seeks is reasonable.  Id. at ¶ 13.

As a benchmark for comparing an attorney's billing rate with the fee customarily charged in the locality, this Court uses the most recent Oregon State Bar (OSB) Economic Survey.  See Bell v. Clackamas Cnty, 341 F.3d 858, 868 (9th Cir. 2003) (court must look to prevailing market rates in the relevant community); Roberts v. Interstate Distrib. Co., 242 F. Supp. 2d 850, 857 (D. Or. 2002) (in determining the reasonable hourly rate, District of Oregon uses OSB Economic Survey as initial benchmark). The most recent OSB Economic Survey was published in 2012.[2]

According to the 2012 OSB Economic Survey, the average hourly rate for Portland attorneys with thirteen to fifteen years of practice is $312 and the median hourly rate is $300. The 25th percentile hourly rate is $261 and the 95th percentile hourly rate is $435.  Millard's requested fee is higher than the average and median hourly rates compared with other Portland attorneys with the same number of years of experience.  However, I agree with Markowitz that

---

[2]  The OSB Economic Survey is available at
www.osbar.org/_docs/resources/Econsurveys/12EconomicSurvey.pdf

$350 is a reasonable hourly rate.  I award more per hour than Judge Brown awarded in April

2012 because as she described in her Opinion in that case, the questions presented there were not

difficult and only a moderate level of skill was required.  Nouredine v. Diversity Escrow Home,

No. 03:11-cv-00410-ST, Op. & Ord. at 12 (D. Or. Apr. 10, 2012).  In contrast, this case required

some specialized knowledge of insurance law and Millard has expertise in this area.  Also, at the

time Judge Brown issued her Opinion, the average hourly rate of attorneys with similar

experience to Millard was below $300 per hour based on the 2007 OSB Economic Survey.  Id.

I decline to award $400 per hour for several reasons.  First, even Plaintiff's own expert

Markowitz does not believe Millard should be compensated at that rate.  Second, that rate is

higher than the average, the median, the 25th percentile, and the 75th percentile rates shown in

the 2012 OSB Economic Survey for attorneys of similar experience.  Third, while Millard

possesses expertise in the area of insurance law, I did not view his firm's handling of the

litigation as better than average which would be required for me to award the $400 per hour rate.

Fourth, the hourly rate requested by Millard, and all counsel, is the same for all time going back

to 2010 even though I presume the rates have increased since that time.  Awarding $350 per hour

for all time, regardless of the year in which the work was performed, gives Plaintiff the

advantage of being awarded fees based on 2013 rates for work which was actually performed in

earlier years.  Any further increase in the rate for time spent before 2013 would be a windfall.

ii.  Bragg

Bragg has been a member of the Oregon State Bar since 2001, and is admitted to practice

in this District, the Ninth Circuit, and the Fourth Circuit.  Bragg Decl. at ¶ 2a.  He states that

since his admission to practice, he has focused on federal and state civil litigation and before

joining Millard, he worked with the "on-premise sign industry," advising it and its members on First Amendment issues.  Id. at ¶ 2b.  He has litigated complex civil rights cases in Oregon, Illinois, North Carolina, and New Hampshire, arguing for the First Amendment free speech rights of small businesses.  Id.  For the past four years, he has been associated with Millard and has focused his practice on the civil litigation of first-party insurance claims, successfully managing numerous fire, theft, and construction claims, including a favorable multi-million dollar settlement following a two-week trial of a case in this District.  Id. at ¶2c.

Markowitz opines that the requested rate of $350 is reasonable for Bragg.  Markowitz Am. Decl. at ¶ 10b.  But, the only specific comments he makes in support of the reasonableness of this rate are that it is within the range of prevailing market rates and that Bragg is respected by leading members of the defense bar as an excellent complement to Millard.  Id. at ¶ 14.

The 2012 OSB Economic Survey shows that for Portland attorneys with seven to nine years of experience (which Bragg would have had in 2010), the average hourly rate is $258 and the median hourly rate is $250.  For Portland attorneys with ten to twelve years of experience, the average hourly rate is $280 and the median hourly rate is $275.  The 25th percentile hourly rate is $233, the 75th percentile hourly rate is $300, and the 95th percentile hourly rate is $428.  In 2012, Judge Brown awarded Bragg $300 per hour based on her assessment that his work was similar to the attorneys in the 75th percentile level which was $290 per hour in the then-controlling 2007 OSB Economic Survey.  Nouredine, Op. & Ord. at 13.  She then adjusted the rate to $300 per hour to account for inflation.  Id.

I award Bragg $280 per hour for his work on this case, the average hourly rate for attorneys in Portland with ten to twelve years of experience.  While Bragg was certainly a

competent attorney, he does not possess the insurance law expertise of Millard and for that

reason, does not warrant an increase over the average hourly rate for lawyers possessing the same

level of experience.  And, while Millard had been practicing insurance law for ten years when

this litigation started, Bragg had been specializing in this area for only one year.  Presently,

Millard has thirteen years of practice in the area while Bragg has four.  Moreover, as explained

above in regard to Millard's hourly rate, Bragg's hourly rate is the same for all years in which he

performed work, even though his rates must have been lower in 2010.  $280 per hour is a

reasonable hourly rate for Bragg, for all hours worked.

### iii.  Fanning

Millard & Bragg first employed Fanning as a law clerk and then as an associate attorney.

Bragg Decl. at ¶ 5.  His resume indicates that he graduated from law school in May 2011 and

began to work at Millard & Bragg in August 2011.  Ex. B to Bragg Decl.  The Millard & Bragg

website indicates that Fanning became a member of the Oregon State Bar in October 2011.

Markowitz opines that $250 per hour is a reasonable rate for Fanning.  Markowitz Am.

Decl. at ¶ 10c.  He offers no specific facts to support his opinion, other than that the requested

rate is within the range of prevailing market rates and that Fanning has two years of legal

experience.  Id. at ¶ 15.  Markowitz is wrong on both counts.  As of this writing, Fanning has two

years of legal experience, but not all of them as a member of the bar, and more importantly, he

did not possess two years of legal experience while performing work on this case.  Instead, he

was a brand new lawyer with no experience when he first started working on behalf of Plaintiff.

And, while Markowitz cites the 2012 Morones Survey of Commercial Litigation Fees in support

of his position that Fanning's requested rate is within the range of prevailing market rates, this

21 - OPINION & ORDER

Court, as noted above, uses the OSB Economic Survey as a benchmark and the rates there are below Fanning's requested rate.

The 2012 OSB Economic Survey shows the average hourly rate for Portland attorneys with zero to three years of experience is $182 and the median hourly rate is $175. The 25th percentile hourly rate for this group of attorneys is $163, the 75th percentile hourly rate is $198, and the 95th percentile hourly rate is $246. As can be seen, Fanning's requested $250 hourly rate is higher than the 95th percentile rate. Because the record provides no support for awarding an hourly rate for Fanning higher than the average hourly rate for attorneys of zero to three years of experience, a reasonable hourly rate for Fanning's work performed as an attorney is $182.[3]

### iv. Kelley and Ennis

Kelley, Plaintiff's corporate counsel, was Plaintiff's attorney until it became apparent that the insurance claim was going to be litigated at which point he referred Plaintiff to Millard. Kelley Decl. at ¶ 1. He is the senior partner of his firm which is located in Silverton. Id. at ¶ 4. His standard hourly rate ranges from $215 to $225 and he opines that $215 per hour was reasonable for the work he performed for Plaintiff. Id. Kelley graduated from law school in 1974, is a member of the Oregon State Bar, and is admitted to practice in this District. Ex. B to Kelley Decl.

Kelley's requested rate of $215 per hour is reasonable. The 2012 OSB Economic Survey indicates that average hourly rate for attorneys of twenty-one to thirty years of experience who practice in the upper Willamette Valley is $225 and the median hourly rate for those attorneys is

---

[3] At the suggestion of Gary Berne, whose Declaration Plaintiff submits in support of its fee request, Plaintiff has reduced Fanning's hours by twenty-five percent to account for his inexperience. I find that the adjustment to the hourly rate accomplishes that goal.

$220.  Because Kelley seeks less than the average and the median, the $215 hourly rate is reasonable.

Ennis is an associate in Kelley's firm and is a 2008 law school graduate.  Kelley Decl. at ¶ 5.  At the time she performed work on the case in 2009, she had one year of experience.  The 2012 OSB Economic Survey shows that for upper Willamette Valley attorneys with zero to three years of experience, the average and median hourly rates are $150.  The 25th percentile hourly rate for these attorneys is $146, the 75th percentile hourly rate is $175, and the 95th percentile hourly rate is $193.  As with Fanning, the record in regard to Ennis provides no support for awarding an hourly rate higher than the average hourly rate for attorneys of zero to three yeas of experience.  A reasonable hourly rate for Ennis's work is $150.

### v.  Bonaparte

As discussed below, I do not award time for the work performed by Bonaparte and thus, do not discuss the reasonableness of his requested $450 hourly rate.

### b.  Law Clerks & Paralegals

Millard & Bragg used four law clerks to assist in the case:  Chris Fanning, Richard Brown, Erin Stefonick/Priest, and Diego Conde.  Bragg Decl. at ¶¶ 4, 5.  As indicated above, Fanning became a member of the Oregon State Bar a few months after starting to work on this case.  Brown and Conde were active members of the Oregon State Bar the entire time they worked on the case.  Id. at ¶ 4. Stefonick/Priest was in the process of seeking admission to practice law, having graduated from law school in December 2008.  Id.  Copies of the law clerk resumes are found in Exhibits A and B to Bragg's Declaration.

Plaintiff seeks $185 per hour for all work performed by all law clerks.  I find nothing in

23 - OPINION & ORDER

the record specifically addressing the reasonableness of the requested hourly rate for law clerks.

In the last couple of years, other Judges in this District have awarded hourly rates of $125, $120,

$100, and $80 for work performed by law clerks.  Marquez v. Harper Sch. Dist. No. 66, No.

02:09-cv-01254-SU, 2012 WL 2469545, at *7 (D. Or. June 26, 2012) (awarding $125 per hour

for law clerk who was a law student); Potter v. Cavaletto, No. 03:10–cv–00124–ST, 2011 WL

5157765, at *5 (D. Or. Oct. 28, 2011) (awarding requested rates of $120 per hour and $80 per

hour for law clerks who had been members of the Oregon State Bar for one to three years at the

time they performed the work); Ogawa v. Malheur Home Tel. Co., No. 03:08-cv-00694-MO,

2011 WL 1299602, at *2 (D. Or. Apr. 1, 2011) ($100 per hour for law clerk who was still in law

school).

During the time that Fanning worked as a law clerk, he was not a member of the Oregon

State Bar and had just graduated from law school.  Based on the fact that the average hourly rate

for Portland attorneys with zero to three years of experience is $182 as reflected in the 2012 OSB

Economic Survey, $185 per hour is not a reasonable hourly rate for a law clerk.  Instead, based

on the decisions in other cases as noted above, I conclude that $110 per hour is a reasonable rate

for Fanning's time.  Similarly, although Stefonick/Priest graduated from law school a few years

before Fanning, she still was not a member of any state bar association.  Thus, a reasonable

hourly rate for her time is also $110.  The other law clerks were members of the Oregon State

Bar with more experience than Fanning and Stefonick/Priest.  Conde has actually practiced law

and Brown has been a licensed attorney since 2006.  As a result, their reasonable rates should be

higher than those for Stefonick/Priest and Fanning.  Still, given that they did not perform work as

an attorney on the case, it would not be reasonable to award them an hourly rate commensurate to

that charged by an attorney. Instead, I find that a reasonable hourly rate for Conde and Brown is $125 per hour.

Plaintiff seeks time for five paralegals at the following hourly rates: (1) Michele Barbara: $170; (2) Tracy Poole: $170; (3) Courtney Pentek: $90; (4) Claire Frye: $110; and (5) Heidi Gross: $90. Millard Decl. at ¶ 4.

Barbara was employed at Millard & Bragg from September 2010 to November 2012 and served as one of the primary "legal assistants" on the case. Id. She describes her work as including (1) collecting and processing discovery; (2) reviewing, analyzing, and coding documents for responses to requests for production and depositions, and reviewing and analyzing eleven binders of claim documentation; (3) preparing for motion hearings and mediation; (4) scheduling and docketing; (5) meeting with experts to assist in identifying and supplying records requested; (6) reviewing, analyzing, and organizing records supporting each seed lot or item of equipment lost in the claim;[4] (7) client communications such as drafting letters and emails to clients and reviewing and editing letters from attorneys; and (8) communications with opposing counsel. Id. Barbara also attended the August 2012 settlement conference with Judge Acosta because of her familiarity with the seed claim documents and records. Id. at ¶ 6.

Barbara's resume shows that she has been a legal assistant since 2002 and a legal assistant/paralegal since 2003. Ex. A to Barbara Decl. She has previous experience as an administrative support specialist and as a legal secretary. Id. She has a paralegal certification from Stanislaus State University. Id.

---

[4] It is unclear how this is different from the task of reviewing and analyzing eleven binders of claim documentation.

Poole's resume indicates that she has an associate's degree in paralegal studies from McNeese State University and has worked for several different attorneys as a paralegal. Ex. A to Thompson Decl. at 1. Missing from her resume are any dates indicating when she obtained her degree or how long she has worked in the field. Id. There is no description of the work she performed in the case. Id.

The only evidence in the record to support the reasonableness of the paralegal hourly rates is the Declaration of Diane Thompson, a paralegal with Markowitz, Herbold, Glade & Mehlhaf, P.C. Thompson Decl. at ¶ 1. Thompson has worked in the legal field for over thirty years and has passed both of the advanced competency exams offered by the national paralegal associations. Id. at ¶ 2. She is the past president of the Oregon Paralegal Association (OPA) and maintains an active support role with that organization. Id. at ¶ 4. She currently sits on the paralegal education advisory board for Pioneer Pacific College in Oregon and for Clark College in Washington. Id. at ¶ 3.

Thompson states that according to a 2009 Survey conducted by the OPA, the minimum hourly rate charged by those responding to the Survey was $90, the average hourly rate was $150, and the highest rate charged was $210. Id. at ¶ 6. In an updated 2012 Survey, the minimum hourly paralegal rate is $90, the average is $178, and the highest is $220. Id. at ¶ 7. In Thompson's opinion, based on her review of the experience and credentials of the paralegals who performed work on this case, the requested rates are reasonable.

Although the OSB Economic Surveys contain no information regarding paralegal billing rates, Judges in this District have noted that a reasonable hourly rate for a paralegal should not exceed that of a first year associate. Knowledge Learning Corp. v. Nat'l Union Fire Ins. Co. of

Pittsburgh, No. 03:10-cv-00188–ST, 2011 WL 2133824, at *6 (D. Or. Apr. 19, 2011) (reducing requested paralegal hourly rate from $215 and awarding hourly rate of $165 based on paralegal's extensive experience), adopted by Judge King (D. Or. May 27, 2011); see also HMM Enters, LLC v. Geppert, No. 03:12-cv-01874-MO, 2013 WL 3461922, at *2 (D. Or. July 9, 2013) (finding requested hourly rates of $100 and $90 reasonable as they were below average for first-year associate and "in line with other paralegal fee awards"); Prison Legal News v. Umatilla Cnty., No. 02:12-cv-01101-SU, 2013 WL 2156471, at *7 (D. Or. May 16, 2013) (awarding paralegal hourly rates of $125, $105, and $90 and noting they did not exceed average rate for first-year associate); but see Oregon Realty, 2013 WL 3287092, at *6  (awarding paralegal $215 per hour based on her twenty years of experience even though it was more than the average for a first-year associate).

Putting aside for the moment that some of the tasks the paralegals performed are clerical in nature and not compensable as part of an attorney fee award, I find the $170 hourly rate for both Barbara and Poole to be unreasonably high.  The 2012 OSB Economic Survey shows that the average hourly rate for Portland attorneys with zero to three years of experience is $182. While this is above the requested rate for Barbara and Poole, the attorney hourly rate is used as a ceiling and is not by itself determinative of a reasonable hourly rate.  As indicated above, recent decisions have awarded much lower hourly rates for paralegal time, with many awards in the $100 to $125 per hour range.  Given Barbara's certification and her approximately ten years of paralegal experience as of 2013, I find $125 per hour to be a reasonable hourly rate for her paralegal work.  However, I find Poole's reasonable hourly rate to be $115 because even though she possesses an associate's degree in paralegal studies and has experience as a paralegal, the

record contains no information regarding how long she has held that certificate or how many years she has worked in the field.

The resumes for the remaining paralegals do not support Plaintiff's assertion that any of them has any education or experience as a paralegal. Frye has some undefined education at a secretarial school and Fairleigh Dickinson University as well as work experience through 2008 as a medical records clerk, legal assistant, law office secretary/receptionist, and office manager. Ex. A to Thompson Decl. at 5. Pentek's resume reflects no education and shows only that she worked as a legal assistant for five months in 2012 and as an evictions processor for two months in 2012. Id. at 6. Gross's resume indicates that she has a Bachelor of Arts degree from Tulane University and has worked as an administrator and legal secretary at Millard & Bragg since 2001. Id. at 7. Generally, the resumes show that these employees perform clerical tasks. Without more, I award $50 per hour for each of these employees but only if, as explained below, the records demonstrate that they performed non-clerical tasks. See Sterling Sav. Bank v. Derek L. Brown & Assocs., Inc., No. 03:10–cv–00674–BR, 2013 WL 164424, at *4 (D. Or. Jan. 15, 2013) (awarding $50 per hour for paralegals/assistants when record lacked information as to their experience); Rustamova v. Astrue, No. 03:11–cv–00751–BR, 2012 WL 5879483, at *2 (D. Or. Nov. 20, 2012) (awarding $50 per hour for paralegal time when the plaintiff provided no information as to the experience of the paralegal).

2. Subsection (2)(a) - Reasonable Number of Hours

Under subsection (2)(a), I analyze the time and labor required in the proceeding, the novelty and difficulty of the questions involved, and the skill needed to properly perform the legal services. To start, I do not find that the issues presented in the case were exceedingly novel

28 - OPINION & ORDER

or complex.  Certainly, Plaintiff's loss included several categories of property such as equipment, seed belonging to others, and seed belonging to Plaintiff.  And, the claim was more complicated than many because within each category of property there were dozens of individual items or seed lots that Plaintiff needed to account for.  There were also some overlapping issues with the separate case brought by Plaintiff's landlord Ionian Corporation against Defendant which were not typical for a first-party insurance case such as this.  However, the case was essentially a breach of contract claim for lost property and while the nature of the loss and some of the positions taken by the parties may have made it more complicated than other insurance contract cases, no single issue was exceedingly novel or difficult to such a degree that the entire case as a whole can be described as novel, difficult, or complex.  To the extent the case was more difficult or complex than similar cases, this is reflected in the number of hours claimed and allowed, as further discussed below.

> a.  Defendant's Objections

Defendant objects to several categories of time spent by Plaintiff's counsel.  First, Defendant objects to any fees incurred before December 2010.  Defendant calculates this date by counting six months from June 2010, when Plaintiff gave Defendant its revised proof of loss with attached schedules.  Defendant agues that given the six-month period of O.R.S. 742.061 in which Defendant had to make a reasonable settlement offer, it cannot be responsible for fees incurred before December 2010, six months after it received Plaintiff's revised schedules of claimed losses.

The case law does not support Defendant's position.  "[F]ees incurred before a lawsuit is filed against an insurer may be recovered [under O.R.S. 742.061] 'as long as they are reasonably

29 - OPINION & ORDER

related to the action itself.'" <u>Malbco Holdings</u>, 2010 WL 2572849, at *5 (quoting <u>Farmers Ins.</u>

<u>Co. of Or. v. Trutanich</u>, 123 Or. App. 6, 16, 858 P.2d 1332, 1339 (1993)).  "The issue is not

whether the fees were incurred by [the insured] prior to filing a proof of loss, . . . but whether the

fees reasonably related to [the insured's] effort to obtain insurance coverage for the [loss]."  <u>Id.</u>

Here, Kelley's time records show that he and Ennis reviewed the insurance policy, spoke to the

adjustor, reviewed and analyzed coverage issues, reviewed the "fire report," assisted Plaintiff

with the first proof of loss, reviewed letters, conferred with Defendant's counsel, and more.  Ex.

A to Kelley Decl.  Putting aside other issues such as both attorneys billing for "inter firm

conferences," the time spent by Kelley and Ennis was reasonably related to Plaintiff's efforts to

obtain insurance coverage for the loss and is awardable under O.R.S. 742.061.

     Millard & Bragg's time records similarly reveal that the time Millard and Bragg spent

from February 2010 when they were retained, until the litigation was filed in August 2010 was

reasonably related to Plaintiff's efforts to obtain insurance coverage for the loss.  Ex. B(a) to

Berne Decl. (containing eleven pages of time entries beginning February 15, 2010 through

August 31, 2010, and showing time spent on tasks such as meeting with the client to discuss the

claim process, reviewing opposing counsel's request for documents, reviewing the insurance

policy, reviewing documents produced by client in support of insurance claim, preparing client

for the EUOs, revising the proof of loss and schedules, drafting a demand letter, drafting the

Complaint, and more).  The time spent by Millard & Bragg before December 2010, if otherwise

proper, is reasonably related to obtaining compensation from Defendant for Plaintiff's loss and is

compensable under O.R.S. 742.061.

     Defendant also objects to any time spent after the August 2012 judicial settlement

30 - OPINION & ORDER

conference because Defendant believes that Plaintiff acted unreasonably by rejecting Defendant's offer out of hand, walking out of the conference, and refusing to continue settlement discussions. As indicated above, I find both parties responsible for the continuation of the litigation.  As another example and in regard to the August 2012 settlement conference in particular, Plaintiff, in contrast to the description of the conference provided by Defendant, states that while the driving issue at the time was valuation of Plaintiff's lost property, Defendant came to the conference without valuation information or unwilling to provide what valuation information it had to Plaintiff.  I reject Defendant's contention that Plaintiff alone acted unreasonably.  Time spent by Millard & Bragg after August 2012 is properly compensable.

Next, Defendant objects to time billed for clerical tasks.  I agree with Defendant that tasks which are clerical in nature are not properly billed as attorney fees but are overhead expenses absorbed by counsel.  E.g., Bakewell v. Astrue, 03:10–cv–01525–JE, 2013 WL 638892, at *3 (D. Or. Jan. 9, 2013) ("costs associated with clerical tasks are typically considered overhead expenses reflected in an attorney's hourly billing rate, and are not properly reimbursable") (citing Missouri v. Jenkins, 491 U.S. 274, 288 n. 10 (1989) ("purely clerical or secretarial tasks should not be billed at a paralegal [or lawyer] rate, regardless of who performs them"); Frevach Land Co. v. Multnomah Cnty., No. 03:99-cv01295-HU, 2001 WL 34039133 at *12 (D. Or. Dec. 18,  2001) (inappropriate "to bill a client or to seek fees under a fee-shifting statute, for purely secretarial tasks")).

"Tasks considered clerical include, but are not limited to, filing motions with the court, filling out and printing documents, preparing affidavits and drafting certificates of service, organizing files, calendaring dates, rescheduling depositions, and sending documents."  Sterling

Sav. Bank v. Sequoia Crossing, LLC, No. 03:09–cv–00555–AC, 2010 WL 3210855 at *7 (D. Or.

Aug. 11, 2010); see also Frevach, 2001 WL 34039133, at *12 (tasks such as proofreading,

indexing, or assembling documents are not compensable because they are overhead and thus

already "reflected in the hourly billing rate.").

      The deductions for clerical time are noted on the spreadsheet appended to this Opinion as

"Attachment 1 Spreadsheet."  I deducted the time for what I considered to be purely clerical tasks

as described in the preceding paragraph.  However, I allowed the time when the entry suggested

that judgment and skill were required for analyzing and reviewing documents rather than what

appeared to be organizing or filing.  A few entries were disallowed as vague when I could not tell

from the description whether or not the task was clerical.  Additionally, Bragg has entries in

which he described time spent "filing" a document with the Court.  E.g., Entry dated July 11,

2012 for 0.2 hours.  Ordinarily, filing a document is considered a clerical task and for the past

several years, that involves just a few keystrokes on the computer.  Just because Bragg, the lead

attorney on the case, billed the time, does not make it any less clerical.

      Defendant next objects to what it calls "vague" entries which Defendant argues fail to

make clear if the work performed related to the coverage issue or other tort claims.  Defendant

objects further to other entries that do not appear to relate to any claim at issue in the case or are

so inadequately described it is impossible to determine whether they were reasonable.  In Exhibit

14 to Thenell's July 25, 2013 Declaration, Defendant notes its "vague" objection to specific time

spent by Plaintiff.  Defendant argues that all time which it objects to as vague should be

compensated at only fifty-percent of the requested time.  I have independently reviewed all of the

entries Defendant objects to as vague and any deductions made for vague entries are reflected in

32 - OPINION & ORDER

the Attachment 1 Spreadsheet.  As should be clear, I overrule most of Defendant's vague

objections as I found the vast majority of the challenged entries to be reasonable and appropriate

as well as to contain an adequately detailed description of the task performed.  However, to the

extent I have sustained a "vague" objection, I deduct the time entirely because it is Plaintiff's

burden to establish how the time was spent and that it was reasonably related to the claim on

which it prevailed.  If the time entry is too vague to make that assessment, it should not be

awarded at all.

Defendant also objects to entries involving multiple attorneys or staff.  Specifically,

Defendant objects to several entries where attorneys met with other attorneys or law clerks or

paralegals and all separately billed for the time.[5]  Defendant argues that this is needless

duplication of effort and the time should be discounted entirely.

Generally, "[w]hen attorneys hold a telephone or personal conference, good 'billing

judgment' mandates that only one attorney should bill that conference to the client, not both

attorneys." Nat'l Warranty Ins. Co. v. Greenfield, No. 03:97–cv–01654–ST, 2001 WL 34045734,

at *5 (D. Or. Feb. 8, 2001); see also Marquez, 2012 WL 2469545, at *9 (good billing practice

requires that only one attorney bill for time spent in conference with multiple attorneys;

excluding duplicative hours billed by attorney with lower hourly rate); West Linn Corporate

Park, LLC v. City of West Linn, No. 03:01–cv–01787–HZ, 2011 WL 4708774, at *13-14 (D. Or.

---

[5]  Defendant also objects to work performed on the same task by more than one attorney
when there is no explanation for why more than one attorney was required.  From the briefing, it
appears that this objection is captured in Defendant's objections noted as "vague" which, as
explained, I have carefully reviewed.  Also, as explained herein, I made some deductions for time
I found to be excessive in relation to the task and separately reviewed the cumulative time spent
on motions.

Oct. 4, 2011) (reducing requested fees because of duplicative meetings among counsel; indicating that such duplication is inconsistent with a higher hourly rate based on counsel's expertise).

Defendant's expert Stockton opines that the practice of each attorney billing for conferences among lawyers is not reasonable. Stockton Decl. at 8-9. He states that a certain amount of conference time among co-counsel may be justified in any case, but not the number of hours claimed in this case. Id. at 9. Additionally, he states that the justification and necessity of such conference time should be set forth in the billing. Id. Finally, he notes that even under those circumstances where the time is justified and appropriately explained, typically one attorney, usually the senior attorney, bills for the time. Id.

Berne also indicated that the amount of conference time was high. Berne Decl. at ¶ 11. As his request, Bragg provided information to Berne about the total time each Millard & Bragg attorney or law clerk, as well as paralegal Barbara, spent in conferences with each other. Id. (showing hours so spent). At Berne's recommendation, Plaintiff states it has reduced the total conference time by twenty-five percent. Id.; Millard Decl. at ¶ 4.

Although I appreciate Plaintiff voluntarily reducing counsel's hours, nowhere in the record has Plaintiff pointed to the actual time entries that it considered to be part of the totals Bragg gave to Berne from which the twenty-five percent reduction was taken. Thus, on this record, I cannot tell whether a time entry shown in Exhibit A to Millard's Declaration that I determine to be unnecessarily duplicative of another attorney's time has been accounted for in Plaintiff's subtraction.

As a result, I reviewed each individual time entry in Exhibit A to Millard's Declaration.

34 - OPINION & ORDER

Deductions for unnecessarily duplicative time for intra-office meetings are noted in the

Attachment 1 Spreadsheet.[6]  In making these deductions, I examined each billing entry and erring

in Plaintiff's favor, disallowed time claimed by counsel and staff only for time spent on the same

day regarding the same subject and for the same amount of time.  If the meetings were not clearly

overlapping, I did not deduct the time.  When I found duplication, I awarded the time to the

person with the higher billing rate.  For example, if Bragg and Millard both billed for a meeting, I

disallowed the time billed by Bragg but allowed it for Millard.  Similarly, if Bragg and Barbara

both billed for meeting, I disallowed the time billed by Barbara but allowed it for Bragg.

I also gave Plaintiff's attorneys the benefit of the doubt in interpreting their billing entries.

For example, there were several dates on which Bragg or Millard billed time for meeting with

Fanning, but Fanning did not bill for any meeting time.  Instead, his entry contained time spent

on substantive work.  In these instances, I assumed that Fanning exercised his billing judgment to

omit time spent in the duplicative meeting.  For example, on November 8, 2012, Bragg billed for

time directing Fanning to prepare a memo on actual cash and replacement cost value.  Fanning

did not describe meeting with Bragg as part of the time he spent on the project.  If he had, I

would have deducted the overlapping meeting time.  Because he did not, I allowed him the entire

time shown.

Additionally, I allowed some isolated conferences among counsel and staff because I

determined that they were appropriate in these specific instances:  (1) April 11, 2012 discussions

among staff regarding trial preparation; (2) August 7, 2012 preparing for mediation; (3) August

---

[6]  There is a separate, unrelated duplicative deduction for certain billing entries in May
and June 2013 where Plaintiff mistakenly claimed time for the exact same entry more than once.
These are noted as "Duplicative of Same Day Entry."

14, 2012 touring Plaintiff's facilities; (4) September 10, 2012 discussions about experts; and (5) September 18, 2012 discussions about experts.

Next, Defendant objects to any time spent by Bonaparte who was retained for the express purpose of preparing the fee petition. See Bonaparte Decl. at ¶ 6 (Bonaparte's firm retained because of its expertise in the area of attorney fee litigation). Defendant notes that Millard & Bragg is intimately familiar with the proceedings and facts of this case and further, that Bragg has been directly involved in the attorney fee phase of the litigation. Bragg Decl. at ¶ 31. Also, Defendant notes that Plaintiff hired both Markowitz and Berne to offer opinions to the reasonableness of rates and time spent. As a result, Defendant argues that there is a significant amount of duplication of effort by adding yet another attorney to litigate the entitlement and reasonableness of fees when Millard & Bragg were already acquainted with the case and fully capable of making their arguments to the Court.

Plaintiff states that given Defendant's position that Plaintiff was not entitled to fees at all and the amount at stake, it was justified in hiring Bonaparte who served as counsel of record on the leading cases developing the issue of entitlement to fees under O.R.S. 742.061. Pl.'s Reply Mem. at 11; see also Markowitz Decl. at ¶¶ 17-18 (describing Bonaparte as one of the premier insurance coverage attorneys in Oregon and as a result of his involvement in insurance coverage cases, he has considerable depth and expertise in the area of attorney fees; opining that it was reasonable to associate Bonaparte and a "sound strategic move" that significantly raised the risk to Defendant, both in preparation for mediation of the fee issue and in the event the issue proceeding to adjudication of Plaintiff's fee motion). In recognition of some duplication of time necessitated by Bonaparte's unfamiliarity with the case, Plaintiff, in its Reply Memorandum, has

36 - OPINION & ORDER

subtracted some of Bonaparte's time as well as some additional hours Bonaparte describes as "miscellaneous," reducing Bonaparte's fee by 28 hours or $12,600.

I find shifting of the time spent by Bonaparte to Defendant to be unreasonable. Clearly, Millard & Bragg had the familiarity with the case to prepare the attorney fee petition. As practicing attorneys who profess to have expertise in litigation, they certainly have the skill to prepare that type of filing. Moreover, they should be skilled enough to read the relevant cases and make Plaintiff's argument in support of an award of attorney fees without having to separately employ a high-priced attorney who, because of his unfamiliarity with the case, expended many hours on tasks that Millard & Bragg attorneys would not have needed to spend.

Moreover, I am troubled by many of Bonaparte's time entries which appear excessive as related to the task, leading me to question his efficiency which in turn leads me to question the degree of his expertise. For example, Bonaparte spent 13.6 hours on Markowitz's twelve and one-half page Declaration. Ex. A to Bonaparte Decl. Bonaparte's "paralegal assistant" spent another 1.5 hours related to Markowitz's Declaration. Id. The first five pages of that Declaration contain boilerplate information about Markowitz and his expertise in fee litigation. The Declaration does not begin to address any information specific to this case until page six. When both Bonaparte and Markowitz are experts in fee litigation and fee awards, it should not have taken more than a few hours to prepare Markowitz's Declaration.

I am also troubled by the concept of hiring a separate attorney for a specific piece of litigation. Understandably, in some cases, lawyers with more experience in actually trying cases may be brought on before trial if the primary attorney has little or no actual trial experience. In such situations, I would expect to see very little time billed by the primary attorney after the trial

attorney takes over.  However, hiring a new attorney for a specific task such as preparing a

summary judgment motion, a fee motion, or a discovery motion does not seem reasonable

outside of the very rare case with exceptional circumstances.  If the current attorney cannot

perform these tasks him or herself or by consulting someone within his or her own firm, then it

may be that the attorney lacks the experience and skill required by the case and the client.  Here,

as indicated, both Millard and Bragg possess more than enough experience to have prepared the

fee petition without hiring another attorney.

  As a result, I award no time to Bonaparte or his staff other than a finite number of hours

spent on certain tasks necessary for the fee petition which Millard & Bragg likely would have

spent if Bonaparte had not and which were not duplicated by Millard & Bragg.  Based on my

review of all of the hours spent on the fee petition by both Millard & Bragg and Bonaparte's firm,

and on my review of the fee petition filings submitted by Plaintiff, I determine that the following

time spent by Bonaparte is compensable under O.R.S. 742.061:  (1) 5.0 hours for preparing

Markowitz's Declaration; (2) 4.0 hours for preparing Berne's Declaration; (3) 5.0 hours for

research and analysis of relevant caselaw and statute; (4) 5.0 hours for researching and

communicating with potential experts; (5) 2.0 hours for communicating with opposing counsel,

the mediator, and others; (6) 8.0 hours for preparing the Declarations of Kelley, Barbara, and

Thompson; (7) 5.0 hours for preparing for mediation; (8) 10.0 hours for factual research and

review regarding billing entries; and (9) 5.0 hours for motions regarding page limits, extensions,

and a protective order.  The total hours awarded is 49.  However, because Millard & Bragg

should have performed these tasks themselves and because Bragg was the attorney at Millard &

Bragg primarily responsible for the fee petition, I award these hours to Plaintiff at Bragg's hourly

rate as determined above.

Additionally, as can be seen in the Attachment 1 Spreadsheet, I deducted several hours spent by Millard & Bragg in the fee petition phase caused by the unnecessary association of Bonaparte.  Whenever the billing entry appeared to show time relating to communicating with Bonaparte, I disallowed it as unreasonable.  I allowed fees for substantive tasks.

Finally, in my review of the time entries, I noted a couple of entries which reflected what I determine to be excessive time for the task described.  These are noted on the Attachment 1 Spreadsheet.  As an example, on February 15, 2010, Millard billed 0.8 hours for drafting a letter of representation to Defendant's counsel.  Ex. A to Millard Decl. at 1.  A letter of representation is a routine document in any lawyer's practice.  Omitting the heading, this letter was approximately one page in length, consisting of five paragraphs, with the first and last paragraphs consisting of one sentence each.  The first paragraph states that Millard had been retained to represent Plaintiff.  The last paragraph asks for a certified copy of the insurance policy, surely a routine request in any insurance case.  It is unreasonable for a seasoned insurance litigation attorney to bill 0.8 hours for such a routine task.  No more than 0.4 hours is reasonable.

I also separately reviewed the total hours spent by Plaintiff on each of the summary judgment motions and other motion practice and conclude that the total time was not excessive in the context of this case.

### b.  Plaintiff's Multiplier Request

Plaintiff requests a 1.5 multiplier for the hours spent by Millard & Bragg on the substantive, non-fee, portion of the case.  Plaintiff argues that the multiplier is warranted because of the contingent nature of the case, there are relatively few lawyers who will pursue such cases

39 - OPINION & ORDER

without the inducement of a potential enhancement in the event of success, and because

Defendant's counsel was unreasonable in not accommodating legitimate requests of opposing

counsel.  See Markowitz Decl. at ¶ 20 (noting the high risk and contingent nature of the

litigation, Defendant's alleged persistent refusal to settle, Defendant's vigorous resistance to

coverage, Defendant's litigation tactics which caused Plaintiff's counsel to expend considerable

additional time, as well as the experience and skill of counsel and the favorable, significant

award obtained in this "hard fought" case).

     As noted above, the contingent nature of the case was muted as soon as six months

passed without Defendant making a settlement offer.  The fact that the case was "hard fought"

and protracted is, as previously described, attributable to both parties.  And, the length of the case

and the time expended by Plaintiff's counsel on various issues raised by Defendant is recoverable

as time spent on the case.  There is no need to multiply the otherwise reasonable attorney fee

award which already pays Plaintiff's counsel for the time it spent defending against what Plaintiff

perceived to be aggressive litigation tactics by Defendant.

          c.  Time Spent by Kelley

     In my review of Kelley's hours, I noted three time entries in which both Kelley and Ennis

billed for an intra-firm conference.  As indicated above, this time is unreasonably duplicative.  I

award the time to Kelley and thus, deduct the following time from the time entries listed in

Exhibit A to Kelley's Declaration:

          0.1 hours by Ennis on 9/1/2009

          0.1 hours by Ennis on 9/9/2009

          0.1 hours by Ennis on 9/14/2009

40 - OPINION & ORDER

I also find the following entries to be insufficiently descriptive of the task performed, making it impossible to tell if the time was reasonably related to the claim for the loss, and thus, I deduct the following time:

0.3 hours by Kelley on 9/21/2009 for "Review Document" for $64.50

0.1 hours by Kelley on 10/23/2009 for "Telephone conference" for $21.50

Thus, I deduct 0.4 hours from the 20.75 hours requested by Kelley.  At a rate of $215 per hour, the award is $4,375 (20.75 hours minus 0.4 hours, times $215).  For Ennis, I deduct 0.3 hours from the 18.2 requested.  At a rate of $150 per hour, the award is $2,685.  The total award for Kelley's firm is $7,060.

### d.  Costs as Part of Award

Plaintiff seeks $20,048.69 in what is classifies as "expenses separately billed" and listed as photocopy charges, postage, delivery fees, mileage fees, and electronic research.  Millard Decl. at ¶ 4a.  Millard states that his office separately tracks and bills these "special overhead expenses" and they are properly included as attorney fees.  I disagree.

Typically, expenses such as those listed are considered costs, not fees.  E.g., Potter v. Crosswhite, No. 03:09-cv-00814-PK, 2011 WL 2149420, at *6 (D. Or. May 5, 2011) (indicating that photocopying and postage are costs), adopted by Judge King (D. Or. May 31, 2011); Schmitt v. VAG Group, Inc., No. 03:09-cv-00380-HU, 2010 WL 3732980, at *6 (D. Or. Aug. 12, 2010) (describing expenses for photocopying, postage, and Westlaw research as costs); see also Old Navy, LLC v. Ctr. Devs. Or., LLC, No. 03:11–cv–00472–KI, 2012 WL 3261413, at *2 (D. Or. Aug. 8, 2012) (noting that under Oregon law, "'[r]easonable attorneys' fees include such costs as photocopies, computer-aided research, and deposition costs that are directly billed to and paid for

by the client.'") (quoting <u>Robinowitz v. Pozzi</u>, 127 Or. App. 464, 470–71, 872 P.2d 993 (1994))
(emphasis added).

Although, as the <u>Old Navy</u> case notes, these costs may be recoverable under an attorney

fee provision when separately billed to and paid for by the client, I do not award them in this case

because according to the excerpt of the settlement agreement quoted by Plaintiff in its

Memorandum in Support of Motion for Attorney Fees and Prejudgment Interest, the release and

discharge is "inclusive of all costs[.]"  Pl.'s Mem. at 2.  Thus, while these expenses may be

awarded as part of an attorney fee award in certain circumstances, they are in fact properly

considered costs and in this case, under the settlement agreement, they are not reimbursable as an

attorney fee under O.R.S. 742.061.

In summary, I award $539,443.20 in attorney fees to Plaintiff, broken down as follows:

$518,663.20 for the time spent by Millard & Bragg;

$ 13,720 for 49 hours of time spent by Bonaparte but awarded at Bragg's $280 hourly

rate;

$ 7,060 for time spent by Kelley & Kelley.

III.  Prejudgment Interest

Plaintiff seeks an award of $944,772.50 in prejudgment interest.  Defendant argues that

Plaintiff is not entitled to prejudgment interest in any amount.

Prejudgment interest in this case is governed by O.R.S.§ 82.010, which provides for

simple interest at the rate of nine percent per annum on "[a]ll moneys after they become due[.]"

O.R.S. 82.010(l)(a); <u>Citicorp Real Estate, Inc. v. Smith</u>, 155 F.3d 1097, 1107 (9th Cir. 1998)

("[a]s a general rule, in diversity actions, state law determines the rate of prejudgment interest,

42 - OPINION & ORDER

and postjudgment interest is governed by federal law") (internal quotation marks omitted).  The Oregon Supreme Court recently explained that the "[j]ustification for the "general rule" that interest accrues on money only after it "becomes due" is because"[o]nce due, the debtor has the use of money to which the debtor is not entitled, while the delay in payment deprives the creditor of that use."  Strawn v. Farmers Ins. Co. of Or., 353 Or. 210, 241, 297 P.3d 439, 458 (2013).

Under Oregon law, a court may award prejudgment interest only when the exact amount, and the time from which interest should run, is ascertained or easily ascertainable.  Farhang v. Kariminaser, 230 Or. App. 554, 556, 217 P.3d 218, 219 (2009); see also MLM Prop., LLC v. Country Cas. Ins. Co., No. CV 06–3048–CL, 2010 WL 678149, at *9 (D. Or. Feb. 25, 2012) ("'prejudgment interest may be awarded if: (1) the exact pecuniary amount is ascertained or ascertainable by simple computation, or by reference to generally recognized standards, such as market price, and (2) a time of definite default is ascertainable '") (quoting Soderhamn Mach. Mfg. Co. v. Martin Bros Container & Timber Prods. Corp., 415 F.2d 1058, 1064 (9th Cir. 1969)).

"[T]he fact that the amount owed cannot be ascertained without resolving complex issues of fact does not bar a determination that the defendant owed sums certain at a date certain."  Jones v. Dorsey, 193 Or. App. 688, 692-93, 91 P.3d 762, 765 (2004).  In a 2002 case where the insureds alleged that their insurer had breached the insurance contract by paying insufficient compensation to adequately repair roof damage, the Oregon Court of Appeals upheld the trial court's award of prejudgment interest despite the defendant's argument that "the amount owed was neither ascertained nor easily ascertainable because, first, plaintiffs submitted different amounts at different times before and during trial and, second, the amount plaintiffs ultimately

43 - OPINION & ORDER

pleaded differed from the amount defendant offered and both these amounts differed from the jury's determination." Strader v. Grange Mut. Ins. Co., 179 Or. App. 329, 338, 39 P.3d 903, 908 (2002). Summarizing, the court stated: "Defendant, in other words, bases its argument entirely on the proposition that, unless the parties agree as to the amount of damages or the amount derives from the automatic application of an agreed-upon formula, prejudgment interest is improper." Id. The Strader court explained that Oregon courts had abandoned the line of prejudgment interest cases the defendant relied on. Id. at 338-39, 39 P.3d at 908-09. Rather, Oregon courts adopted an approach where prejudgment interest is appropriate notwithstanding that a defendant disputed liability and the jury did not award plaintiff all the damages it sought or where "damages are not ascertainable until issues of fact have been decided by the jury[.]" Id. at 339, 39 P.3d at 909 (internal quotation marks omitted). As the court stated, "[p]ut another way, although there are questions of fact about the amounts owed, that does not mean that defendant did not owe sums certain at dates certain." Id. (internal quotation marks and brackets omitted).

Plaintiff divides its contract damages into three categories: (1) business interruption loss; (2) business personal property loss (meaning both scheduled and unscheduled equipment); and (3) loss of seed (both of Plaintiff's and belonging to others). Plaintiff argues that the loss for each category was easily ascertainable as of October 28, 2009, sixty days after the fire.[7] Starting with that date, and based on payments made to Plaintiff by Defendant of $700,000 on September 20, 2011, $1,425,000 on April 18, 2013 (characterized by Plaintiff as payment for lost seed and

---

[7] Plaintiff argues that the losses were capable of being ascertained on the date of the fire based on the presence of Defendant's adjustors, agents, and counsel at the scene on that date. Plaintiff then adds sixty days pursuant to O.R.S. 742.238 which gives fire insurers sixty days after the proof of loss is filed to pay for covered losses.

business interruption), and $1,195,000 on May 13, 2013 (characterized by Plaintiff as payment for scheduled and unscheduled equipment), Plaintiff calculates, based on the nine-percent per annum statutory rate, that Defendant owes it $944,772.50 in prejudgment interest.

Defendant argues that neither the amount due nor the date it became due are ascertainable. Defendant contends that Plaintiff has still failed to substantiate the values of the property losses and that in settlement, no admission as to liability was made. Rather, the amounts were paid to settle the litigation in light of the risk of further recovery. Defendant notes that there are no findings of fact establishing Plaintiff's claimed losses.

Neither party's position is supportable or reasonable. Plaintiff's losses occurred on the date of the fire, August 26, 2009. But, that does not mean that they were ascertained or ascertainable on that date. While the calculations required to determine the amount of loss may be relatively straightforward, the information required to perform those calculations was not available to Plaintiff or Defendant on the actual date of the fire. For example, to determine the loss Plaintiff sustained for a particular piece of equipment, the parties needed to know the cost of the item when new, its age and condition, and its useful life so that one could assign a replacement cost to the item and then subtract the depreciation. See Jan. 23, 2013 Daubert Hrg. Trans. at 11-12 (testimony by Byron Slack, Defendant's expert on equipment valuation, stating that he appraises equipment value by first consulting with dealers to obtain the new cost of the item and then making deductions for obsolescence and depreciation; to determine depreciation, he surveys the used market and determines the "going" price for the pieces of equipment) (Dkt #149); Ex. 4 to Oct. 5, 2012 Supp'l Bragg Decl. (Slack Expert Report) at 13-20 (explaining valuation analysis) (Dkt #68); Ex. J to Pl.'s Expert Narratives (Robert Halsey Expert Report) at 1

45 - OPINION & ORDER

(describing valuation analysis as value of property purchased new with a deduction for age and condition) (Dkt #181); Ex. L to Pl.'s Expert Narratives (Michael Rodrigue Expert Report) at 2-3 (explaining valuation analysis of starting with replacement cost as of August 2009 based on documents from the insured, then subtracting the percent of depreciation or betterment of the item; noting that the industry standard to establish the percentage of depreciation or betterment is based on the expected life of the item; further noting sources used to confirm life expectancy of various items) (Dkt #181). Given that Plaintiff did not produce an initial proof of loss statement to Defendant until mid-November 2009, more than two months after the fire, Plaintiff cannot reasonably argue that its losses were ascertainable by simple computation or by reference to generally recognized standards on August 26, 2009. The date of the fire did not start the sixty-day time period under O.R.S. 742.238.

Defendant's position is equally untenable. The substantive portion of this case was settled in early April 2013, just weeks before trial and after the submission of all pretrial filings. Thus, the only remaining "costs of litigation" were for counsel's attendance at trial which, while not insignificant, would not amount to the $2.6 million Defendant agreed to pay at that time. Additionally, a defendant will always be able to argue that it settled "for the costs of litigation" as a way to avoid prejudgment interest. Allowing Defendant here to prevail on that argument would undermine the justifications for a prejudgment interest award. And while there are no findings of fact from a jury establishing Plaintiff's actual claimed losses, Defendant's own experts rendered opinions supporting certain amounts of losses for Plaintiff's property. Accordingly, Defendant's position that the money it paid to settle the case does not represent payment for any actual losses is unreasonable.

46 - OPINION & ORDER

Because both sides have failed to present tenable positions to the Court on the prejudgment interest issue, I am forced to review the record without assistance from the parties and to determine, in accordance with Oregon law, whether Plaintiff's claimed losses were ascertainable and if so, at what point.  Plaintiff bears the burden of proof on this issue.  See Farhang, 230 Or. App. at 556, 217 P.3d at 219 (quoting trial court decision on prejudgment interest); see also Interserve, Inc. v. Fusion Garage PTE Ltd., No. C 09-5812 RS, 2012 WL 1995278, at *3 (N.D. Cal. June 4, 2012) (it is plaintiff's burden to show that prejudgment interest is appropriate); Lakin v. Watkins Associated Indus., 6 Cal. 4th 644, 660, 25 Cal. Rptr.2d 109, 119, 863 P.2d 179, 189 (1993) ("It is plaintiff who is claiming prejudgment interest; thus, under the general rule it is plaintiff who bears the burden of proving each fact essential to an award of such interest[.]").

Defendant incorrectly suggests that Plaintiff having changed the amount of its claimed losses during the course of litigation demonstrates that the losses were not ascertainable.  Strader, discussed above, disposes of that argument.  Moreover, Defendant's attempt to distinguish Strader is without merit because there, like here, the defendant argued that the amount owed was not ascertained or easily ascertainable because the plaintiffs submitted different amounts at different times before and during trial, because the amount plaintiffs ultimately pleaded differed from the amount defendant offered, and because both these amounts differed from the jury's determination.  179 Or. App. at 338, 39 P.3d at 908.  As the Strader court explained, the jury heard conflicting testimony on damages based on evidence of actual expenses and prevailing market rates.  Nonetheless, once the jury resolved the dispute, prejudgment interest on the award was appropriate.  Id. at 339-40.

Similarly here, the record contains conflicting evidence on damages based on differing valuations and differing assessments of actual losses, meaning whether certain equipment or seed was actually destroyed.  Although there is no jury determination, an issue discussed below, the fact that there is conflicting damages evidence or that Plaintiff's claimed losses varied over time does not alone require a determination that the losses were not ascertained or not ascertainable. This is true even when there is conflicting expert testimony.[8]  E.g., Macheca Transp. Co. v. Phila. Indemn. Ins. Co., No. 4:04-CV-178, 2012 WL 5948900, at *1 (E.D. Mo. Nov. 28, 2012) (damages may be ascertainable for an award of prejudgment interest even when the "parties' experts compute different estimates of the loss") (internal quotation marks omitted); I-Systems, Inc. v. Softwares, Inc., No. Civ. 021951, 2005 WL 1430323, at *16 (D. Minn. Mar. 07, 2005) (rejecting the defendant's argument that the plaintiff was not entitled to prejudgment interest because the parties presented conflicting expert testimony on damages).

However, Defendant is correct that there is no jury verdict, special interrogatories answered by the jury, or language in the settlement agreement establishing the amount of Plaintiff's actual losses.  This does create some problems.  In those cases where the amount of loss is disputed during litigation, there is at some point a determination of the loss, allowing an award of prejudgment interest on the amount of actual loss and from the date when the loss was incurred or default occurred.  For example, in Strader, although there were differing amounts of damages posited throughout the litigation, the jury resolved the dispute and arrived at its own

---

[8]  And for good reason.  If a dispute among experts was enough to preclude prejudgment interest, a defendant would almost always be able to locate an expert who would put forth a competing value to the plaintiff's expert in order to manufacture a conflict just for the purpose of avoiding the prejudgment interest obligation.

damages figure.  179 Or. App. at 339-40, 39 P.3d at 909.  Once the jury made its determination, the court properly explained that the previous disputes over the assessment of damages, did not, from the "objective, postjudgment perspective" the court employs in "determining whether the amount of damages and starting date of interest are ascertainable," make prejudgment interest improper.  Strader, 179 Or. App. at 339-40, 39 P.3d at 909.

Similarly, in Isler v. Shuck, the dispute concerned an employment agreement signed by the defendant in which he agreed to pay the plaintiffs certain amounts representing a percentage of fees earned from services performed for certain clients if he terminated his employment with the plaintiffs.  38 Or. App. 233, 235, 589 P.2d 1180, 1181 (1979).  Disputes about the amount of damages arose because there were many factors the jury had to consider such as which party had the established client relationship.  Id. at 239, 589 P.2d at 1183.  But, once it was determined which category the various accounts fell in, the formula for awarding damages presented no difficulty.  Id.  As a result, the court explained that "[t]he categorization did present questions of fact, but that does not lead to the conclusion that because there were categorical disputes, there could not be a determination that defendant owed sums certain at dates certain."  Id.  Because the jury resolved those disputes, there were "monies due" at particular times.  Id. at 240, 589 P.2d at 1184.  Prejudgment interest was properly allowed.

The cases indicate that disputed liability or disputed claim value do not prevent the post-judgment award of prejudgment interest.  But, there still must be some basis in the record upon which to base the prejudgment interest award.  There must be some finding in the record as to what the losses were.  If the record does not include a basis on which to make that finding, the plaintiff has not met its burden to show that the loss was ascertained or ascertainable as of a

49 - OPINION & ORDER

specific date.

Here, I conclude that on this record, Plaintiff is entitled to prejudgment interest for the equipment losses but not for the seed losses. Plaintiff fails to show that all of the approximately $3.2 million it received from Defendant was in payment of Plaintiff's actual losses.[9] As I stated, Defendant's argument that all the money it paid to Plaintiff in April and May 2013 was for the cost and risk of litigation is unreasonable. Nonetheless, it is likely that some of that money was in fact paid for that purpose while some it was paid for Plaintiff's actual losses. The issue is what the record shows regarding the value of Plaintiff's losses.

Defendant challenged the very existence of some of the property that Plaintiff claimed was lost. Absent factual findings by a jury or language in the settlement agreement that Plaintiff recovered payment for that property, Plaintiff fails to sustain its burden that the settlement payments are attributable to specific losses. But, Defendant cannot dispute that it owed money to Plaintiff for the losses its own experts opined Plaintiff sustained and in the values that its own experts rendered. As a result, Defendant cannot deny that those losses were ascertainable or actually ascertained.

The problem for Plaintiff is that while Slack's opinion on equipment value accounts for the equipment that Slack opines was not found at the site, Katharyn Thompson, Defendant's primary seed claim expert, expressed no opinion as to whether the seed Plaintiff claims to have

_____

[9] Plaintiff states in its Memorandum that the $1,425,000 payment Defendant made on April 18, 2013 was for seed and business interruption losses and the $1,195,000 Defendant made on May 5, 2013 was for equipment losses. Pl.'s Mem. at 30. But, Plaintiff cites no evidence in support of this assertion. And, it is contradicted by Defendant's assertion that in settling the case, it made no admission as to liability and all the money paid was attributable to the cost and risk of litigation. Def.'s Opp'n Mem. at 33.

50 - OPINION & ORDER

lost in the fire was actually lost in the fire. Slack assessed the "actual cost value" of scheduled and unscheduled equipment that he found at the scene or that he determined was reasonable to account for. Ex. 4 to Oct. 5, 2012 Supp'l Bragg Decl. (Slack Expert Report) at 21-43. His opinion of $819,199 in actual cash value for Plaintiff's equipment loss excluded any equipment Defendant may have challenged as not having been lost in the fire.

In contrast, Thompson made clear in her report and in her Daubert hearing testimony that while she opined on the value of Plaintiff's claimed seed losses, she was not opining on whether the seed lots were lost in the fire. E.g., Ex. 3 to Oct. 5, 2013 Supp'l Bragg Decl. at 6 (Thompson cannot confirm that any of the claim lost seeds were in the building that burned because Plaintiff was moving inventory at the time of the loss and did not track inventory by location or building and because the post-loss physical inventory was discarded); Jan. 23, 2013 Daubert Hrg. Trans. at 43 (in discussing a particular seed lot, Thompson testified that although it was being claimed and there were sufficient records to substantiate the claimed quantity, she could not verify that those particular seeds were lost in the fire); at 51 (explaining that there potentially could have been $1,252,376 of inventory lost in the fire); at 73 (stating that she does not offer an opinion as to what seed lots were actually burned in the fire). Thus, her expert report is best understood as assuming all of the seed lots Plaintiff claimed actually existed and then assigning a value to each lot by multiplying the quantity claimed by the value as given to her by seed quality valuation expert Kevin Loe. See Jan. 23, 2013 Daubert Hrg. Trans. at 74 (explaining that her opinion was rendered by starting with Plaintiff's claimed lots, confirming quantities by examining the records, taking the claimed value, and multiplying by the price adjustment given by Loe).

Although Thompson testified at the Daubert hearing that "there were seeds lost in the

fire," without a jury verdict, a jury's answers to special interrogatories, or something in the settlement agreement attributing payment to the seed lot claim, the record does not allow me to conclude what part of th $2.6 million Defendant paid in April and May 2013 is attributable to the seed claim. As a result, in contrast to the cases discussed above, the disputed issue regarding what seed lots were actually lost in the fire has never actually been resolved. Even though Thompson conceded that some seed was lost in the fire, and even though photographs show burned bags of seed at the scene, Ex. 3 to Jan. 11, 2013 Bragg Decl. (Dkt #106), the loss has not been ascertained and is not ascertainable by simple computation or by reference to industry standards because the dispute over the very existence of at least some of the seed lots remains outstanding on this record.

In a recent Oregon Court of Appeals case, the court indicated that even in cases where it seems that the facts must be capable of sustaining an award of prejudgment interest, it sometimes cannot be made. Spaid v. 4-R Equip., LLC, 252 Or. App. 228, 243-44, 287 P.3d 1138, 1147 (2012), rev. denied, 353 Or. 280, 298 P.3d 30 (2013). There, the court considered the issue of prejudgment interest on a jury award of backpay. The defendant had opposed the prejudgment interest request for several reasons, including that the amount of damages upon which prejudgment interest would accrue was not ascertainable because the jury did not provide the mathematical calculation that it used to arrive at its $200,000 backpay award. Id. at 231. The trial court declined to award prejudgment interest. On appeal, the court acknowledged several "settled legal principles" including that prejudgment interest can be properly awarded where a claimant's damages are not ascertainable until issues of fact have been decided by a jury and that where a claim for prejudgment interest depends on the resolution of disputed facts, those facts

52 - OPINION & ORDER

are within the province of the jury to decide.  Id. at 235, 287 P.3d 1138.

There were several disputed issues of fact regarding the plaintiff's claim for backpay, including when he would have retired, the amount of wages he would have earned absent termination which in turn depended on the number of hours he worked which had tended to fluctuate, and whether he would have accepted an offer of alternative employment with lower pay.  Id. at 235, 242, 287 P.3d at 1146.  The parties had not submitted the issue of the plaintiff's entitlement to prejudgment interest to the jury, nor was the jury instructed to make any findings of fact with respect to that issue.  Id. at 230, 287 P.3d at 1140.  Thus, the defendant argued there were unresolved issues of fact precluding an award of prejudgment interest.  Id. at 241-42, 287 P.3d at 1146.

The court explained that some of the factual disputes "evaporated" in the face of the jury award and because of the method of calculation presented by the Plaintiff.  For example, the court explained that it did not matter whether the jury believed that the plaintiff would have retired at any of the various ages on which there was evidence presented because the plaintiff's proposed interest calculation assumed a retirement date in accordance with the "*defendant's* evidence[.]"  Id. at 242, 287 P.3d at 1146.  Similarly, there was no pertinent dispute about when the prejudgment interest would start to accrue because again, the plaintiff's proposed interest calculation assumed the latter of two possible dates, a calculation favorable to the defendant.  Id.

However, the court found that a determinative issue of fact remained unresolved.  Id.  The court explained that without a specific finding by the jury, it could not determine exactly how the jury arrived at the $200,000 back pay award and as a result, depending on a variety of possible scenarios, the total amount of prejudgment interest could vary.  Id. at 243, 287 P.3d at 1147

(noting, as examples, that the jury could have made its backpay calculation based on an unstated

finding that the plaintiff would have worked for an additional five years at an annual salary of

$40,000, or, could have worked for four additional years at an annual salary of $50,000, and

stating that if the amount of backpay and benefits accrued at each interval was lower than the

amount the plaintiff used in his calculation, the total of prejudgment interest would vary

accordingly).  It was at that point that the court said:

> It is tempting to acknowledge that, regardless of that uncertainty
> [regarding the salary computation], there must be an irreducible amount of
> prejudgment interest that the evidence in this case would require, and to remand to
> the trial court to calculate and impose that amount.  The difficulty is that . . . the
> jury - not the trial judge - was required to determine the pertinent disputed facts to
> arrive at the proper calculation.  Because that did not occur, we are unable to
> conclude that he trial court erred in failing to make an award of prejudgment
> interest in this case.

Id. at 243-44, 287 P.3d at 1147.

Here, as explained above, Defendant cannot deny that Slack's report offered a valuation

of the equipment he concluded was on site and destroyed in the fire and thus, prejudgment

interest on that amount is supported by this record.  As in Spaid, any objection by Defendant to

an interest award on the equipment loss "evaporates" because the interest calculation is based on

evidence relied on by Defendant.  But, also as in Spaid, while it seems that there must be some

prejudgment interest award based on the seed loss, the record does not allow for it given the

remaining unresolved disputed issues of fact.

Accordingly, Plaintiff is awarded prejudgment interest on $819,199 of actual

ascertainable losses for equipment (actual cash value of $476,669 for scheduled equipment;

actual cash value of $342,350 for unscheduled equipment); Ex. 6 to Def.'s Expert Narrative

54 - OPINION & ORDER

Stmts (Dkt #160).  And, because I find the record creates no dispute that Plaintiff was entitled to

the policy limits for business interruption losses, Plaintiff is awarded prejudgment interest on

$25,000 for that loss.

    As to the time that the losses were ascertainable, as indicated above, I reject Plaintiff's

argument that the day of the fire plus sixty days is the proper date on which the losses became

due.  However, I agree with the position Plaintiff previously took that its equipment and seed

losses became ascertainable on the date it submitted its first proof of loss to Defendant.  Thus, I

determine that the November 13, 2009 proof of loss submitted to Defendant is the date the

equipment and seed losses became ascertainable and thus, under O.R.S. 742.238, sixty days from

that date, or January 11, 2010, is the date of default.  As to the business interruption loss, I do not

see how that loss could have been ascertained any earlier than one year from the fire given that

the loss is based on a comparison of Plaintiff's net profit or loss in the year after the fire to what it

would have made absent the fire.  Thus, the date of default for the $25,000 business interruption

loss is sixty days from August 26, 2010, or October 24, 2010.

    The record also shows that Defendant paid $700,000 to Plaintiff in September 2011.

While the contemporaneous correspondence surrounding that payment suggested that it was not

intended as payment for a particular loss, Ex. 5 to July 25, 2013 Thenell Decl. (stating that the

payment would be "attributed towards available coverages at the discretion of Country . . .

tendered to the insureds as partial payment of undisputed sums" but not further identifying the

actual loss for which the payment was made), Defendant later represented to this Court that it

was payment for the actual cash value of lost equipment.  Attchmt. 1 to Court's Nov. 2, 2012

Minute Entry (Dkt. #79).  Accordingly, I have calculated the amounts and interest payment based

55 - OPINION & ORDER

on the following:

January 11, 2010:  payment for ascertainable loss of $819,199 for equipment became due;

October 24, 2010:  payment of ascertainable loss of $25,000 for business interruption loss became due;

September 29, 2011:  payment of $700,000 for equipment losses made; remaining balance on equipment loss:  $119,199.

April 18, 2013:  payment of $1,425,000 made;

May 15, 2013:  payment of $1,195,000 made.

Prejudgment interest in the amount of $148,671.55 is awarded to Plaintiff.[10]

## CONCLUSION

Plaintiff's motion for attorney fees and prejudgment interest [221] is granted in part and denied in part.  Plaintiff is awarded $539,443.20 in attorney fees and $148,671.55 in prejudgment interest.

IT IS SO ORDERED.

Dated this _____ Day of _____, 2013

Marco A. Hernandez
United States District Judge

---

[10]  The calculations used to arrive at this figure are explained in Attachment 2.